SMITH v MICHIGAN BASIC PROPERTY
INSURANCE ASSOCIATION

Docket Nos. 90632, 90639. Argued March 4, 1992 (Calendar No. 8).
Decided September 29, 1992.

Elmer and Myrtle Smith brought an action in the Wayne Circuit
Court against Michigan Basic Property Insurance Association
to recover benefits under a fire insurance policy after their
home and its contents were completely destroyed. Before trial,
the court Michael J. Connor, J., determined that if the plain-
tiffs obtained a favorable verdict they could recover the full
replacement cost of their home, not to exceed policy limits,
without first having to repair or replace it. The insurer was
directed not to introduce evidence of the plaintiffs' alleged
poverty, their dependence on public welfare, or their under-
employment to show motive to burn the home or for any other
purpose. After trial, the court entered judgment on a jury
verdict for the plaintiffs that found that the fire was not
deliberately set, that no material fact or circumstance concern-
ing the cause or origin of the fire, the value of the insured
property, or the extent of loss and damage sustained was
misrepresented or concealed, and that the insurer had not
wilfully denied the claim with a callous disregard for the
plaintiffs' rights. The Court of Appeals, MacKenzie, P.J., and
Doctoroff, J. (T. G. Kavanagh, J., dissenting in part), in an
unpublished opinion per curiam, vacated the case and re-
manded it for a new trial, finding that an inquiry concerning
the plaintiffs' financial condition should have been allowed and
that the replacement cost of the home could be recovered
without having to repair or replace it (Docket No. 112808).
Both parties appeal.

In an opinion by Justice Levin, joined by Chief Justice
Cavanagh, and Justices Brickley, Riley, and Mallett, the
Supreme Court held:

Before an insurer becomes liable to pay the difference be-

REFERENCES

Am Jur 2d, Insurance §§ 1504-1507.
Construction and effect of property insurance provision permitting
recovery of replacement cost of property. 1 ALR5th 817.

tween the actual cash value and replacement cost under a replacement cost provision of a fire insurance policy, an insured must actually repair, rebuild, or replace the home at the same or another site.

1. An insurer is not liable for the difference between the actual cash value of a home and the replacement cost policy limit unless the home is actually repaired, rebuilt, or replaced at the same or another site. In this case, the policy provided that the insurer was to pay no more than the actual cash value of the damage unless actual repair or replacement was completed. Where an insurer asserts defenses of arson or fraud in good faith, the insured is not automatically entitled to payment of replacement cost following a jury's rejection of the defenses.

2. While the plaintiffs could not be expected to repair, rebuild, or replace their home while litigation was pending, once it has been determined that they were entitled to payment of actual cash value without regard to whether they repaired, rebuilt, or replaced, and to replacement cost if they did, the insurer's defenses no longer stands in the way of lender-assisted financing.

3. The trial court's ruling barring the introduction of evidence of the plaintiffs' financial condition would not be an appropriate basis for disturbing the verdict.

Reversed and remanded.

Justice BOYLE, joined by Justice GRIFFIN, concurring in part and dissenting in part, stated that although the evidentiary error was harmless, the trial court erroneously concluded that *People v Henderson,* 408 Mich 56 (1980), barred admission of the plaintiff's tax returns for any purpose. Because there was other evidence of incendiary origin, the probative value of the specific evidence was its logical relevance to motive for arson and to fraud relating to personal loss.

Arson may be proven by circumstantial evidence. Motive plus access or opportunity may establish arson in a civil context. The overwhelming weight of authority permits introduction of specific evidence of financial need in a civil case. In this case, the proof offered is specific and relevant to the plaintiffs' financial motive.

INSURANCE — FIRE INSURANCE — REPLACEMENT COST — ACTUAL CASH VALUE.

Before an insurer becomes liable to pay the difference between actual cash value and replacement cost of a home under a replacement cost provision of a fire insurance policy, an insured must actually repair, rebuild, or replace the home at the same or another site (MCL 500.2826; MSA 24.12826).

*Fabian & Sklar, P.C.* (by *Stuart A. Sklar, Michael H. Fabian,* and *Jo Robin Davis*), for the plaintiffs.

*Dykema, Gossett* (by *Donald S. Young* and *Kathleen McCree Lewis*) and *Patrick, Johnson & King, P.C.* (by *Paul H. Johnson, Jr.,* and *Judith A. Friday*), for the defendant.

Amicus Curiae:

*Richard E. Shaw* for the Michigan Trial Lawyers Association.

LEVIN, J. Two questions are presented:

(1) Whether an insured can recover under a replacement cost provision of a fire insurance policy without actually repairing, rebuilding, or replacing the property at the same or another site. We conclude that, although the insurer denied coverage on the grounds that the fire was caused by the insureds and they had committed fraud in reporting the loss and the jury found the fire was not caused by the insureds and there was no fraud, the insureds must nevertheless actually repair, rebuild, or replace at the same or another site before the insurer becomes liable to pay the difference between actual cash value and replacement cost.

(2) Whether the circuit judge erred in ruling that the insurer may not introduce evidence of the financial condition of the insureds to show motive or for any other purpose. We conclude that although evidence of the financial condition of an insured may, in particular cases, be admissible to prove motive or for other purposes, the judge did not err in ruling that Michigan Basic could not, in

the instant case, introduce evidence of the financial condition of the Smiths.

I .

Elmer and Myrtle Smith insured their home in Trenton, Michigan, with the Michigan Basic Property Insurance Association against fire loss. The policy provided for replacement cost coverage on the home with a policy limit of $56,000.[1]

The Smiths' home and its contents were completely destroyed by fire. Michigan Basic claimed that the Smiths had deliberately set the fire, and that they had committed fraud in reporting the loss. When it appeared that the home would not be repaired, the City of Trenton demolished what was left of the structure. The Smiths commenced this action in circuit court.

Before trial, the Smiths moved for a determination whether, in the event of a favorable verdict, they would be allowed to recover the replacement cost of the home not exceeding the $56,000 policy limit instead of the stipulated $7,500 actual cash value.[2] Michigan Basic contended that it was obliged to pay only the actual cash value of the home in the event the Smiths obtained a favorable verdict with regard to the arson and fraud issues, because the Smiths had not completed repair or

[1] Among the other coverages were unscheduled personal property with a policy limit of $28,000, and additional living expense with a policy limit of $11,200.

[2] The parties agreed that the actual cash value of the home, in disrepair and in a depressed neighborhood, was $7,500. They also agreed that the "replacement cost value" of the home is $56,000, the policy limit, that the Smiths' additional living expenses are $6,652.15, that the Smiths would be entitled to $2,500 for debris removal, and thus that the "only issue of damages that the Jury is going to have to decide regarding the claim is the value of the contents loss."

The jury determined that the actual cash value of the personal property damaged or destroyed in the fire was $26,061.16.

Following the jury's verdict, a judgment for $90,607.92 plus interest was entered in favor of the Smiths.

replacement of the home as both the policy[3] and the statute[4] require.

---

[3] The policy issued by Michigan Basic contained the following clause:

We will pay no more than the actual cash value of the damage unless: (a) actual repair or replacement is complete; or (b) the cost to repair or replace the damage is both: (i) less than 5% of the amount of insurance in this policy on the building; and (ii) less than $1000. [Section I-Conditions, ¶ 3, Loss Settlement, Subdivision b(4).]

It is also provided in the "Loss Settlement" section of the policy that if the amount of insurance is eighty percent or more of the full replacement cost, the insurer will pay the cost to repair or replace, without deduction for depreciation, not exceeding the lesser of (a) "the limit of liability under this policy that applies to the building; (b) the replacement cost of that part of the building damaged for like construction and use on the same premises; or (c) the necessary amount actually spent to repair or replace the damaged building." Where the amount of insurance is less than eighty percent, the insurer will pay the greater of the actual cash value or that proportion of the cost to repair or replace, without deduction for depreciation, that part of the building damaged which the total amount of insurance bears to eighty percent of the replacement cost. *Id.,* Subdivision b(1), (2).

[4] When the policy was issued and at the time of the loss, the Insurance Code provided:

Riders and endorsements may, in consideration of adequate premium or premium deposit, be added to the standard fire insurance policy, insuring property, whereby the insurer agrees to reimburse and indemnify the insured for the difference between the actual value of the insured property at the time any loss or damages occurs, and the amount actually expended to repair, rebuild or replace with new materials of like size, kind and quality, but not to exceed the amount of liability covered by the riders or endorsements, such property as has been damaged or destroyed by fire or other perils insured against, except that there shall be no liability by the insurer under the terms of said riders or endorsements to pay the amount specified in the riders or endorsements *unless the property damaged is actually repaired, rebuilt or replaced at the same or another site.* [MCL 500.2826; MSA 24.12826. Emphasis added.]

1990 PA 305 revised § 2826 of the Insurance Code to provide:

An insurer may issue a fire insurance policy, insuring property, by which the insurer agrees to reimburse and indemnify

Observing that the arson and fraud allegations would have made it extremely difficult for the Smiths to obtain financing to rebuild the home, the judge ruled and later entered an order that, in the event the Smiths obtained a favorable verdict, they were, pursuant to *Pollock v Fire Ins Exchange,* 167 Mich App 415; 423 NW2d 234 (1988), "entitled to recover the full replacement cost value of their home not to exceed policy limits without first having to repair or replace same."

The judge also entered an order in limine directing that "pursuant to the holding of *People v Henderson,* 408 Mich 56; 289 NW2d 376 (1980)," Michigan Basic "shall not introduce any evidence of plaintiff Elmer and Myrtle Smith's alleged poverty, dependence on public welfare, unemployment, underemployment, low paying or marginal employment to show motive or for any other purpose . . . ."

The jury found, in a special verdict form, that the fire was not deliberately set, that the Smiths had not deliberately set or caused the setting of the fire, and that the Smiths did not know of and consent to the setting of the fire for the fraudulent purpose of attempting to recover under the policy issued by Michigan Basic. The jury also found that the Smiths had not misrepresented or concealed any material fact or circumstance concerning the

the insured for the difference between the actual value of the insured property at the time any loss or damages occurs, and the amount actually expended to repair, rebuild, or replace with new materials of like size, kind, and quality, but not to exceed the amount of liability covered by the fire policy. A fire policy issued pursuant to this section may provide that there shall be no liability by the insurer to pay the amount specified in the policy unless the property damaged is actually repaired, rebuilt, or replaced at the same or another site. [MCL 500.2826; MSA 24.12826.]

cause or origin of the fire, the value of the insured property, or the extent of loss and damage sustained. The jury further found that Michigan Basic had not "wilfully denied the Plaintiffs' claim with a callous disregard for the Plaintiffs' rights under the policy."

The Court of Appeals[5] vacated and remanded for a new trial, stating that the judge should have allowed inquiry concerning the Smiths' financial condition, but affirmed the judge's ruling that the Smiths could recover the replacement cost of the home without actually having repaired or replaced it.[6] As earlier stated, we disagree with the Court of Appeals on both questions.

We remand this case to the circuit court with the direction that the judgment for $90,607.92 entered in favor of the Smiths be modified to require the payment, without regard to whether they actually repair, rebuild or replace the home, of $42,107.92[7] plus interest, and to require an additional payment of an amount not exceeding $48,500[8] plus interest when and if the Smiths actually repair, rebuild or replace the home.

II

Michigan Basic introduced expert testimony

[5] *Smith v Michigan Basic Property Ins,* unpublished opinion per curiam, decided September 26, 1990 (Docket No. 112808).

[6] The Court of Appeals did not advert to *Pollock,* and predicated affirmance on the replacement cost issue on a provision of the Insurance Code (MCL 500.2827[3]; MSA 24.12827[3]) not cited by either party at trial or on appeal. The Smiths acknowledge that the statutory provision relied on by the Court of Appeals does not apply to the policy of insurance issued to them. They contend that the judge correctly ruled on the authority of *Pollock* and other cases cited in their brief.

[7] This apparently consists of the $26,061.16 the jury determined to be the fair actual cash value of the personal property damaged or destroyed in the fire, the stipulated additional living expense of $6,652.15, actual cash value of the home of $7,500, and $2,500 for debris removal, less a stipulated offset of $605.39.

[8] The difference between the $7,500 actual cash value of the home and the stipulated replacement cost value of $56,000, the policy limit.

tending to show that the fire resulted from the ignition of flammable liquids and had been deliberately set, and additional expert testimony that there was no evidence indicating that the fire was accidental. Still another expert witness, for the Smiths, testified that he believed that the fire was caused accidentally by a short circuit in the wiring leading to a refrigerator. The state police were unable to find evidence of a flammable substance on testing samples taken from the home.

The Smiths purchased the two-story, single-family residence for approximately $6,500 in 1973, over thirteen years before the fire. After they purchased the home, the City of Trenton rezoned the property for commercial use. Only two houses remained on the Smiths' block at the time of the fire. Approximately fifteen to twenty other structures in the neighborhood had been removed between the purchase of the home and the time of the fire.

Michigan Basic introduced evidence tending to show that the home was in a state of disrepair. A Trenton housing inspector testified that inspections beginning in 1975 revealed code violations, including electrical and plumbing problems. The Smiths were informed of the need to obtain an electrical permit before the violations were corrected. The Smiths did not, however, obtain the required permits and the code violations had not been corrected before the fire. Additional code violations were observed in an April, 1986, inspection.

In March, 1987, a Trenton inspector notified the Smiths that he intended to enter the property and conduct a more extensive inspection. The inspection was delayed for a short time at the request of the Smiths to allow them time to make repairs.

Elmer Smith fixed a broken water pipe, and was in the process of installing a new linoleum floor.

The fire occurred on the day before the rescheduled inspection, while the Smiths and their children were visiting relatives in Hesperia, Michigan, over four hours driving time from Trenton.

III

We agree with Michigan Basic that it is not liable for the difference between the $7,500 actual cash value of the home and the $56,000 replacement cost policy limit unless the home is actually repaired, rebuilt, or replaced, and that *Pollock* should not be followed.

The fire insurance policy provides that the insurer will pay no more than the actual cash value of the damage unless "actual repair or replacement is complete."[9] The statute[10] provides that there shall be no liability on the part of the insurer under a replacement cost provision "unless the property damaged is actually repaired, rebuilt or replaced at the same or another site."

The Smiths rely on *Pollock, McCahill v Commercial Union Ins Co,* 179 Mich App 761; 446 NW2d 579 (1989), and *Zaitchick v American Motorists Ins Co,* 554 F Supp 209 (SD NY, 1982), aff'd without published opinion 742 F2d 1441 (CA 2, 1983). Michigan Basic contends that *Pollock, McCahill,* and *Zaitchick* were incorrectly decided, and in all events are distinguishable because the jury found that Michigan Basic had not wilfully denied the Smiths' claim with a callous disregard for their rights, while in *Pollock* the Court found "lack of

9 See n 3.
10 See n 4.

good faith processing"[11] of the insured's claim and in *McCahill* the Court followed *Pollock* "under the facts of this case" which included a finding of "extreme and outrageous conduct" by the insurer.[12]

We agree with Michigan Basic that where the insurer asserts in good faith a defense of arson or fraud, the insured is not automatically entitled to payment of replacement cost following a jury's rejection of those defenses. Although, as stated in *Zaitchick, supra,* p 217, "a bank would be chary to lend money on the basis of an unlitigated law suit in which the defendant and its vast resources intend to present several defenses to payment," and, thus, we agree with the Smiths that they could not be expected to repair, rebuild, or replace while this litigation was pending, once it has been determined that they are entitled to payment of actual cash value without regard to whether they repair, rebuild, or replace, and to replacement cost if they do so, the insurer's interposition of arson and fraud defenses no longer stands in the way of lender-assisted financing of repair, rebuilding, or replacement.

The insurance policy provides that the insured may disregard the replacement cost provision and make claim for actual cash value, and then make claim within one hundred eighty days after loss for an additional payment on a replacement cost basis.[13] The Supreme Judicial Court of Maine,

---

[11] *Pollock, supra,* p 422.

[12] *McCahill, supra,* pp 770, 775.

[13] (5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability on a replacement cost basis. [Section I-Conditions, ¶ 3, Loss Settlement, Subdivision b(5).]

construing the same language, said "[t]here is simply no support for the company's argument that the obligation to make a claim imposes the requirement that the replacement building must be 'substantially complete' at the time the claim is made,"[14] and that where, upon the conclusion favorably to the insured of litigation concerning the amount the insurer was required to pay under a replacement cost provision, the trial court did not err in allowing the insured "a year from the date of judgment to replace the home and incur replacement costs."[15]

While Michigan Basic's unwillingness to recognize the Smiths' claims may, as a practical matter, have disabled them from undertaking the repair, rebuilding, or replacement of their home, following the conclusion of this litigation, rejecting the claims that the fire was caused by arson or that there was fraud in reporting the loss, the Smiths' interest in obtaining payment of replacement cost can be protected without estopping the insurer from requiring actual repair, rebuilding, or replacement as required by the insurance policy and the statute.

The policy limits Michigan Basic's liability for replacement cost to the lesser of three amounts: (a) the policy limit, (b) the replacement cost for "like construction and use *on the same premises*" (em-

---

[14] *Blanchette v York Mutual Ins Co,* 455 A2d 426, 428 (Me, 1983).

[15] The Plaintiff [insurer] also takes issue with the trial court's determination that the Defendant [insured] should be given one year from entry of the judgment, as a "reasonable time" to replace or rebuild the home and be reimbursed for replacement costs. Neither the policy nor the statute establishes a deadline for the completion of the replacement or rebuilding construction. When no time for performance is specified in the contract, a "reasonable time" is implied. [Citation omitted.] When, as in this case, the facts are undisputed, what is a "reasonable time" raises a question of law. [*Maine Mutual Fire Ins Co v Watson,* 532 A2d 686, 688, 689 (Me, 1987).]

phasis added), or (c) the amount actually and necessarily spent to repair or replace the damaged building.[16] The statute permits repair, rebuilding, or replacement "at the same or another site."[17] Cases in other jurisdictions hold that the "for like construction and use on the same premises" language only applies to the second of the three loss settlement alternatives,[18] and that actual repair or replacement is allowed other than at the site of the loss.[19]

IV

Michigan Basic sought to introduce evidence of the Smiths' financial condition both to show motive to set a fire and to show that they committed fraud in reporting the loss.

A

In ruling that Michigan Basic "shall not introduce any evidence of Plaintiff Elmer and Myrtle

[16] See n 3. It might be argued that this language requires the insured to replace or rebuild at the same location. It appears that the Trenton zoning ordinance, however, precludes the Smiths from doing so.

[17] See n 4 for text.

[18] See n 3 for text.

[19] Cases where the insured recovered replacement cost following rebuilding on different land include *Blanchette v York Mutual Ins Co,* n 14 *supra; Johnson v Colonial Penn Ins Co,* 127 Misc 2d 749; 487 NYS2d 285 (1985), and *Tiffin Ave Investors v Midwestern Indemnity Co,* unpublished opinion of the Ohio Court of Appeals, decided May 28, 1987 (Docket No. 5-85-22). In *Huggins v Hanover Ins Co,* 423 So 2d 147 (Ala, 1982), the insured recovered replacement cost following purchase of a home.

Cases where the insured recovered replacement cost on rebuilding with different materials or structures include *Ruter v Northwestern Fire & Marine Ins Co,* 72 NJ Super 467; 178 A2d 640 (1962), *Metz v Travelers Fire Ins Co,* 355 Pa 342, 345-347; 49 A2d 711 (1946), *Nahmias Realty v Cohen,* 484 NE2d 617 (Ind App, 1985), and *Tenley Enterprises, Inc v Harbor Ins Co,* unpublished opinion of the United States District Court for the Eastern District of Pennsylvania, decided October 9, 1986 (Docket No. 86-1035).

Smith's alleged poverty, dependence on public welfare, unemployment, under employment, low paying or marginal employment to show motive or for any other purpose," the judge relied on this Court's decision in *Henderson,* holding that it was *not* error to permit cross-examination of defendant Henderson[20] concerning his financial condition.

This Court said that it agreed with the statement of the New Jersey Supreme Court that "there must be something more than poverty to tie a defendant into a criminal milieu,"[21] and the statement of the United States Court of Appeals for the District of Columbia Circuit that "[w]here the evidence elicited only demonstrates that the defendant is 'poor,' the inquiry is improper,"[22] adding: "[t]here is a need to avoid undue prejudice in individual cases and to prevent establishment of a 'two-tiered standard of justice' weighing more heavily on the poor. And we recognize that evidence of a defendant's financial condition, because it ordinarily has limited probative value and usually goes to a collateral issue, will often distract rather than aid the jury."[23]

The Court explained that its decision reversing the Court of Appeals did not "allow 'routine use' of evidence of financial condition." The prosecutor's proofs "rather than showing unemployment, established that Henderson was not only employed, but held a managerial position. The evidence that his electricity was shut off for non-payment, viewed in light of this evidence of employment, carried with it no suggestion that Henderson was 'poor.' "[24]

[20] Henderson had been convicted of arson and embezzlement.

[21] *State v Mathis,* 47 NJ 455, 472; 221 A2d 529 (1966).

[22] *Davis v United States,* 133 US App DC 167, 171; 409 F2d 453 (1969).

[23] *Henderson, supra,* p 65.

[24] *Id.,* pp 65-66.

This Court thus drew a distinction "between evidence of poverty and unemployment—evidence that a person is chronically short of funds—and evidence of the sort involved in this appeal, showing that a person is experiencing a shortage of funds that appears to be novel or contrary to what one would expect is typically felt by such a person."[25]

Michigan Basic relies on decisions in other jurisdictions some of which are distinguishable from the instant case because, as in *Henderson,* there were circumstances indicating that there had been a deterioration in the financial circumstances of the person against whom the evidence was offered.[26]

---

[25] *Id.,* p 66.
This Court added:

> Evidence of poverty, dependence on public welfare, unemployment, underemployment, low paying or marginal employment, is not admissible to show motive. The probative value of such evidence is diminished because it applies to too large a segment of the total population. Its prejudicial impact, though, is high. There is a risk that it will cause jurors to view a defendants as a "bad man"—a poor provider, a worthless individual.
>
> Other evidence of financial condition may, however, be admissible in the circumstance of a particular case. [*Id.*]

[26] In *Elgi Holding Inc v Ins Co of North America,* 511 F2d 957 (CA 2, 1975), the court held that it was not error to allow the introduction of evidence concerning the owner's financial difficulties, including that a bank had threatened to foreclose the mortgage on the warehouse immediately before the fire because eight consecutive payments had been missed. Further, the owner had attempted to portray himself as a well-to-do and successful businessman at the trial.

In *Girard v Vermont Mutual Fire Ins Co,* 103 Vt 330, 336; 154 A 666 (1931), the court said that "evidence that plaintiffs were being pressed by creditors was a relevant fact."

In *McIntosh v The Eagle Fire Co of New York,* 325 F2d 99, 100 (CA 8, 1963), the court said that evidence of the insured's income tax returns was admissible "in the posture of this case." In *Carciofolo v US Fire Ins Co,* 38 AD2d 672; 327 NYS2d 141 (1971), the court was similarly cryptic in stating that "upon the record before us" evidence relating to the insured's financial status before the fire had probative force on the issue of motive.

Michigan Basic made no effort to show that there had been a deterioration in the Smiths' financial condition. During the argument on the motion, the Smiths' lawyer stated without objection that the "facts are undisputed that my clients, while not having high income also were not behind on any of their bills, were not in financial distress, were not under any pressure from any creditors or anyone else to pay money. But merely, they're poor people." They had nearly paid in full the mortgage on their home.

The only change in condition concerned the physical condition of the home, and the impending visit of the Trenton Housing Inspector, all of which was explored at the trial.

B

Also during argument on the motion, Michigan Basic's lawyer said that he saw "the problem that

In *Lamb v United States Fire Ins Co,* 88 NH 21; 184 A 169 (1936), the court said that where the family income consisted of a pension of $12.50 a month and an indefinite sum obtained on the occasional sale of wreaths and patchwork quilts, supplemented by relief contributions from the City of Nashua, the pecuniary condition of the insured and of the man she desired to marry were relevant to show a motive for burning the insured property.

In addition to the cases cited by Michigan Basic, courts have allowed the introduction of evidence concerning financial condition that is probative of specific financial problems, deterioration in financial condition, or to rebut a portrayal of financial condition. See *People v Musitief,* 201 Ill App 3d 872, 877-878; 559 NE2d 520 (1990); *C L Maddox, Inc v Royal Ins Co of America,* 208 Ill App 3d 1042, 1051-1052; 567 NE2d 749 (1991); *Ins Co of North America v Musa,* 785 F2d 370, 372 (CA 1, 1986); *Fortson v Cotton States Mutual Ins Co,* 168 Ga App 155; 308 SE2d 382 (1983); *Rist v Commercial Union Ins Co,* 376 So 2d 113, 114 (La, 1979).

See also *Graves v MFA Mutual Ins Co,* 446 SW2d 154, 158 (Mo App, 1969); see also *Zajac v Great American Ins Cos,* 410 NW2d 155, 156 (ND, 1987); *Powell v Merrimack Mutual Fire Ins Co,* 667 F2d 26, 29 (CA 11, 1982); *Morris Stulsaft Foundation v Superior Court,* 245 Cal App 2d 409, 419-420; 54 Cal Rptr 12 (1966); *Arms v State Farm Fire & Casualty Co,* 731 F2d 1245, 1249 (CA 6, 1984); *State v Haugen,* 458 NW2d 288, 291 (ND, 1990); *Childs v Zurich American Ins Co,* 476 So 2d 403, 408 (La App, 1985); 19 Couch, Insurance, 2d (rev ed), § 79:573, pp 542-544.

the Court [in *Henderson*] is addressing there, and I can appreciate the problem," and he was not seeking to ask the jury to conclude that the Smiths "burned the house down or committed fraud simply because they collect public assistance benefits and have for some degree of time." He said he sought primarily to introduce evidence of the Smiths' financial condition to show that they had committed fraud in reporting the loss.

The Smiths had retained State Wide Claim Service to represent them in dealing with Michigan Basic. Katherine Anne Herzog, a licensed public adjuster employed by State Wide, testified that she was unable to inspect or inventory the personal property because of the extensive fire damage. Herzog prepared, with information supplied by Myrtle Smith, a twenty-three-page inventory of the items of personal property claimed to have been destroyed in the fire. The inventory listed a replacement cost of the personal property damage of $41,841 and an actual cash value of $26,061.[27]

Michigan Basic contends that an examination of the inventory reflects that the Smiths claimed to have acquired well in excess of $5,000 of personal property within the two years immediately preceding the fire,[28] and that evidence of their financial condition would be probative of the issue of fraud in reporting the loss because such evidence would tend to show that it was improbable that the Smith's had, in fact, acquired property in the amount claimed.

[27] The jury determined that the fair actual cash value of the personal property damaged or destroyed was $26,061.

[28] Our examination of the inventory indicates that the stated *replacement cost* of the personal property acquired within the two-year period is $7,524 and the stated *actual cash value* is $4,871.

"Replacement cost" means a reasonable estimate of the cost of replacing on the market an item of personal property. "Actual cash value" means replacement cost less depreciation.

The inventories of personal property included property belonging to the five children. The two oldest were seventeen or older at the time of the fire. Myrtle Smith testified that some of the property was not new when acquired, and was acquired at garage sales, yard sales, porch sales, and moving sales. The judge's ruling barring the introduction of evidence of the Smiths' financial condition would not be an appropriate basis for disturbing the verdict.

Reversed and remanded to the circuit court for the entry of a modified judgment requiring payment, without regard to whether the Smiths actually repair, rebuild, or replace the home, of $42,107.92 plus interest, and to require an additional payment of an amount not exceeding $48,500 plus interest when and if the Smiths actually repair, rebuild or replace the home.

CAVANAGH, C.J., and BRICKLEY, RILEY, and MALLETT, JJ., concurred with LEVIN, J.

BOYLE, J. (*concurring in part and dissenting in part*). I write separately to state that although in my view the evidentiary error was harmless, I agree with the Court of Appeals that the trial court erroneously concluded that *People v Henderson,* 408 Mich 56; 289 NW2d 376 (1980), barred admission of plaintiffs' tax returns for any purpose. The defendant did not seek to show generally that poor persons are more likely to commit arson than affluent people. Rather, there being other evidence of incendiary origin, the probative value of the specific evidence was its logical relevance to motive for arson and to fraud relating to personal loss. This Court has held that arson may be proven by circumstantial evidence, *Peterson v Oceana Circuit Judge,* 243 Mich 215; 219 NW 934 (1928).

Motive plus access or opportunity may establish arson in a civil context, *O-So Detroit, Inc v Home Ins Co,* 973 F2d 498 (CA 6, 1992), and, as the lead opinion implicitly recognizes, the overwhelming weight of authority permits introduction of specific evidence of financial need in civil cases. See *ante,* p 191, n 15 and 19 Couch, Insurance, 2d (rev ed), § 79:573, pp 542-544.

This is not a situation in which a prosecutor is seeking to prejudice a defendant by suggesting that he is part of the criminal milieu because he is poor. The rationale of *People v Henderson, supra,* is that motive is of *minimal* relevance in a theft offense because greed and not need is the assumed motive for theft. Because one does not lightly destroy one's home or business, the logical force of the relationship between need and deed is greater in the context of an arson. Even here, however, and even with respect to civil cases, it might legitimately be urged that financial need alone is not probative of arson.

What the lead opinion does not acknowledge is that this is not a case where the defense offers to establish arson from evidence of financial need alone. Here, there is other evidence of incendiary origin. The proof offered is specific and relevant to the plaintiffs' financial motive.[1]

Finally, since judgment has entered for plaintiffs, the lead opinion's observations are unnecessary. I would refrain from extending the dicta of

---

[1] I do not quarrel with the fact that the judge has discretion to prevent innuendo from a generalized claim that poverty suggests motive, MRE 403. It would seem to me it would be a rare situation, however, where the prejudicial effect of specific evidence would outweigh probative value and that, in most situations, potential prejudice could properly be addressed by curative instructions. See *Emasco Ins Co v Waymire,* 242 Mont 131; 788 P2d 1357 (1990). Since the trial court felt compelled to exclude the evidence, it erred in failing to exercise discretion.

*Henderson, supra,* until a case is presented in which it can properly be said that the effect of admitting the evidence unfairly prejudiced the plaintiff.

GRIFFIN, J., concurred with BOYLE, J.