S AND S TOBACCO AND CANDY COMPANY, INC., ET AL.
*v.* GREATER NEW YORK MUTUAL INSURANCE COMPANY
(14511)

PETERS, C. J., BORDEN, BERDON, NORCOTT and F. X. HENNESSY, Js.

Argued October 29—decision released December 29, 1992

*Brian M. Gildea,* for the appellant (defendant).

*Francis M. Bosze,* for the appellees (plaintiffs).

PETERS, C. J. The principal issue in this appeal is whether the terms of a fire insurance policy providing coverage for the cost of replacement of a building destroyed by a fire unambiguously limit that coverage to a replacement on the premises on which the fire occurred. The plaintiffs, S and S Tobacco and Candy Company, Inc., and Stanley Seligson,[1] filed an amended complaint charging the defendant, Greater New York Mutual Insurance Company, with a breach of contract for its refusal to pay the totality of the plaintiffs' unpaid claim under the "replacement cost (without deduction for depreciation)" endorsement to a multiperil insurance policy issued by the defendant.[2] The defendant denied liability, alleging that the plaintiffs had failed fully to comply with the terms and conditions of the insurance policy. After a trial to the court, the trial court rendered judgment for the plaintiffs. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The facts are undisputed. The plaintiffs owned a 15,000 square foot building, located on their property at 59 Connecticut Avenue in Norwalk, that they used as a storage warehouse. On July 15, 1985, they purchased from the defendant a multiperil insurance policy covering this building. On September 10, 1985, a fire totally destroyed the building.

---

[1] Stanley M. Seligson was the president of S and S Tobacco and Candy Company, Inc., at the relevant time.

[2] In addition to the count for breach of contract, the plaintiffs' amended complaint included a second count charging the defendant with wilful misconduct and lack of good faith. The second count was not pressed before the trial court and we, therefore, deem it to have been abandoned.

After the fire, the plaintiffs decided that the property on Connecticut Avenue could profitably be put to a use higher than a warehouse. To replace the building destroyed by the fire, they acquired a site on Wilson Avenue in South Norwalk and there erected a larger storage warehouse of approximately 36,000 square feet. The replacement warehouse was ready for occupancy on September 1, 1990, about four and one-half years after the fire.

The multiperil insurance policy covering the original warehouse established $280,000 as the limit of the defendant's liability. Ordinarily, the measure of the benefits payable under fire insurance coverage is the actual cash value of the damaged or destroyed property. As a result of the plaintiffs' purchase of a replacement cost coverage endorsement to the policy, for an additional premium, the defendant undertook to compensate the plaintiffs, in the event of a fire, for replacement costs without regard to any depreciation in the value of the plaintiffs' property.[3]

The plaintiffs promptly filed all required notices and claims of loss with the defendant. The defendant paid the plaintiffs $256,080, the amount of the actual cash value of their claim, but refused to pay the plaintiffs' claim for depreciation in the amount of $23,920. The defendant did not contest the mathematical accuracy of the plaintiffs' calculation of their depreciation claim.[4]

---

[3] The replacement cost coverage endorsement provides: "1. Replacement Cost Clause: The provisions of Section 1 of this policy applicable to the property described as covered on a replacement cost basis are amended to substitute the term 'replacement cost (without deduction for depreciation)' for the term 'actual cash value' wherever it appears in this policy, and the Coinsurance Clause of this endorsement supersedes and replaces all other Coinsurance Clauses otherwise applicable, subject in all other respects to the provisions of this endorsement and of Section 1 of this policy."

[4] As the insurance statement regarding the full cost of repair or replacement demonstrates, the amount of $23,920 is less than the plaintiffs' total depreciation claim. The amount in suit reflects the fact that $280,000 is

The defendant based its refusal to pay the depreciation claim on the plaintiffs' alleged noncompliance with the requirement of the replacement cost coverage endorsement that "the damaged or destroyed property [must] actually [be] repaired or replaced by the insured with due diligence and dispatch."[5] The defendant maintained that the plaintiffs had neither "actually . . . replaced" the destroyed property nor undertaken the requisite replacement "with due diligence and dispatch."

The trial court determined that the plaintiffs had fully complied with the requirements of the replacement cost coverage endorsement and, therefore, rendered a judgment in their favor. The trial court construed the relevant provisions in the insurance policy as including coverage for a replacement building constructed on a site other than that of the building destroyed by fire. The trial court found that the plaintiffs had proceeded with due diligence and dispatch in constructing the replacement building and readying it for occupancy.

On appeal, the defendant raises the same issues that it pursued in the trial court. It contends that the trial court misconstrued the insurance policy and mistakenly found that the plaintiffs had acted with due diligence. We disagree with both contentions.

I

The proper construction of the endorsement permitting an insured to recover its replacement cost without deduction for depreciation, in the event of a fire,

the full amount of the insurance applicable to the property that was destroyed by fire. Because the plaintiffs' actual cash value claim was $256,080, only $23,920 remained for the depreciation claim.

[5] The replacement cost coverage endorsement provides: "3. The Company shall not be liable under this endorsement for any loss unless and until the damaged or destroyed property is actually repaired or replaced by the insured with due diligence and dispatch."

turns on two paragraphs of the endorsement. The parties agree that, to trigger the contract's coverage, the plaintiffs must comply with paragraph 3 of the endorsement, which provides that the defendant "shall not be liable . . . for any loss unless and until the damaged or destroyed property is *actually* repaired or replaced . . . ." (Emphasis added.) They disagree about the relationship between this paragraph and paragraph 5 of the endorsement. Pursuant to paragraph 5, the defendant's "liability for loss on a replacement cost basis shall not exceed the smallest of the following amounts: (a) the amount of this policy applicable to the damaged or destroyed property; (b) the replacement cost of the property or any part thereof identical with such property on the same premises and intended for the same occupancy and use; or (c) the amount actually and necessarily expended in repairing or replacing said property or any part thereof." The trial court held subparagraph 5 (c) rather than subparagraph 5 (b) to be applicable in the circumstances of this case and concluded that subparagraph 5 (c) validated the plaintiffs' depreciation claim for the amount they had actually expended in replacing their destroyed storage warehouse.

The defendant maintains, to the contrary, that the plaintiffs' claim must be measured by a conjoint reading of paragraphs 3 and 5 (b). Focusing on the subparagraph 5 (b) requirement of replacement "on the same premises," the defendant contends that the plaintiffs, having rebuilt elsewhere, have not complied with paragraph 3. The defendant asserts that its construction of the replacement cost endorsement is mandatory for three reasons: (1) the parties stipulated, in the trial court, that the plaintiffs' claim would be measured by paragraphs 3 and 5 (b); (2) the trial court could not consider the applicability of subparagraph 5 (c) because the plaintiffs offered no evidence about the costs of the con-

struction of the new warehouse in South Norwalk; and (3) the prefatory language to paragraph 5 limited the defendant's liability to "the smallest of the . . . amounts" specified in its three subparagraphs. We are unpersuaded.

We can dispose quickly of the defendant's first two contentions. With respect to the first contention, the record discloses nothing by way of a formal or informal stipulation that the plaintiffs' claim would be measured by subparagraph 5 (b). Although the parties directed the court's attention to that subparagraph as being an issue between them, the court, without objection, stated the question to be "whether the term replacement is construed as rebuilding on [the] same site or may it be interpreted as meaning erecting a new building on a different site so long as it is devoted to the same use." With respect to the second contention, the trial court record regarding construction costs does not support the defendant's position on appeal. At trial, the parties agreed about the monetary amount of the plaintiffs' claim, and the defendant successfully objected to an offer by the plaintiffs of documentary evidence to prove their actual expenditures for the replacement building.[6] The plaintiffs have, therefore, not relinquished their asserted right to have their replacement cost claim measured by subparagraph 5 (c).

The defendant's final argument hinges on its understanding of the internal logic of paragraph 5. It focuses on the prefatory language to that paragraph, which states that the defendant's liability "shall not exceed the smallest of the following amounts," i.e., the policy limit, the cost of replacement on the same premises, or the amount actually and necessarily expended for

[6] In light of the fact that the contract limited the defendant's liability to $280,000, it is understandable why the parties at trial did not focus on the precise replacement costs incurred by the plaintiffs.

repair or replacement. The defendant maintains that the plaintiffs cannot rely on subparagraph 5 (c) because their actual expenditures for replacement exceeded both the policy limit and the cost of replacement of the old building on the original premises. It concludes that, on this theory, the plaintiffs' claim can be sustained only under subparagraph 5 (b) and is defeated by their conceded failure to rebuild on the same premises.

Although the defendant's construction of the replacement cost endorsement is not implausible, an alternate construction is equally plausible. Paragraph 3, which defines the coverage provided by the endorsement, limits that coverage to instances in which "the damaged or destroyed property is actually repaired or replaced," but does not expressly require a replacement on the same premises. In its common usage, the term "replaced" includes "substituted." See Webster's Third New International Dictionary; see also *Piazza* v. *Clackamas Water District,* 21 Ore. App. 469, 535 P.2d 554, 557 (1975). Under paragraph 3, a substituted building, as the trial court held, may be located on a different site.

The provisions of paragraph 5 do not compel a different result. First, paragraph 5 by its own terms addresses the amount of the defendant's liability rather than the conditions that the plaintiffs must meet to establish their entitlement to coverage. Second, paragraph 5's principal rule limiting the defendant's liability to the smallest amount payable under any of its three subsections can be read consistently with paragraph 3 to permit the insured to recover costs incurred for replacement at another site. Under subparagraph 5 (a), the defendant's liability can never exceed "the amount . . . applicable to the damaged or destroyed property," i.e., the policy limit of $280,000. The plaintiffs would not, however, have been entitled to recover this amount if their replacement costs actually and

necessarily expended, on the same premises or at another site, had been less than $280,000. Finally, for replacement costs of less than $280,000, the plaintiffs would not have been able to measure their recovery by actual replacement costs at another site if those costs had exceeded "the replacement cost . . . on the same premises." These theoretical limitations on the plaintiffs' recovery are, however, irrelevant in the circumstances of this case, in which the plaintiffs' replacement costs, by any measure, substantially exceeded the policy amount of $280,000.

At the very least, the replacement cost coverage endorsement does not unambiguously limit fire insurance coverage, in all instances, to the costs of an actual replacement on the same premises. Because it is the insurance company that has drafted the terms of the insurance policy, any ambiguity contained therein is traditionally construed against the insurer and in favor of insurance coverage. *Kelly* v. *Figueiredo,* 223 Conn. 31, 36–37, 610 A.2d 1296 (1992); *Streitweiser* v. *Middlesex Mutual Assurance Co.,* 219 Conn. 371, 375, 593 A.2d 498 (1991); *Beach* v. *Middlesex Mutual Assurance Co.,* 205 Conn. 246, 250, 532 A.2d 1297 (1987); *LaBonte* v. *Federal Mutual Ins. Co.,* 159 Conn. 252, 256, 268 A.2d 663 (1970). Although the parties' advocacy of different meanings of the replacement cost coverage endorsement "does not necessitate a conclusion that the language is ambiguous"; *Aetna Life & Casualty Co.* v. *Bulaong,* 218 Conn. 51, 60, 588 A.2d 138 (1991); *Marcolini* v. *Allstate Ins. Co.,* 160 Conn. 280, 284, 278 A.2d 796 (1971); when alternate readings of a clause in an insurance clause are equally plausible, the language in the policy is ambiguous. See *Beach* v. *Middlesex Mutual Assurance Co.,* supra, 251.

As the trial court observed, courts in other jurisdictions have construed similar replacement cost coverage endorsements to include coverage for a

replacement on another site. See, e.g., *Huggins* v. *Hanover Ins. Co.,* 423 So. 2d 147, 150 (Ala. 1982); *Boudreau* v. *Manufacturers & Merchants Mutual Ins. Co.,* 588 A.2d 286, 287 n.5 (Me. 1991); *Smith* v. *Michigan Basic Property Ins. Assn.,* 441 Mich. 181, 490 N.W.2d 864 (1992); *Ruter* v. *Northwestern Fire & Marine,* 72 N.J. Super. 467, 471–73, 178 A.2d 640 (1962); *Johnson* v. *Colonial Penn Ins. Co.,* 127 Misc. 2d 749, 751–52, 487 N.Y.S.2d 285 (1985). The defendant has cited no case supporting its more restricted view, and we have found none. The defendant's contention that the trial court misconstrued the insurance contract cannot, therefore, be sustained.

## II

The defendant's alternate contention is that the plaintiffs are barred from recovery because they did not erect the replacement building with due diligence and dispatch. On this issue, having heard evidence about the circumstances of the new construction, the trial court ruled as follows: "The defendant did question why it took the plaintiffs so long to build the new building, but its main argument is that the terms repair or replace do not encompass the construction of a new building at a new and different location. I am satisfied that the 'due diligence and dispatch' condition was fulfilled by the plaintiffs."

Whether the plaintiffs acted with due diligence and dispatch was a question of fact for the trial court. The defendant did not avail itself of the opportunity to seek from the trial court an articulation of the factual basis for its finding. See Practice Book § 4051. As the appellant, it was the defendant's responsibility to present a record adequate for appellate review of its claim of error. *DiBella* v. *Widlitz,* 207 Conn. 194, 203–204, 541 A.2d 91 (1988); *Barnes* v. *Barnes,* 190 Conn. 491, 493, 460 A.2d 1302 (1983). In the absence of such a record,

we presume that the trial court, in rendering its judgment in favor of the plaintiffs, undertook the proper analysis of the law and the facts. *DiBella* v. *Widlitz,* supra; *Timm* v. *Timm,* 195 Conn. 202, 206, 487 A.2d 191 (1985). The trial court's finding must, therefore, stand.

The judgment is affirmed.

In this opinion the other justices concurred.

