[No. D016627. Fourth Dist., Div. One. July 18, 1994.]

WILLIAM T. CONWAY et al., Plaintiffs and Appellants, v.
FARMERS HOME MUTUAL INSURANCE COMPANY, Defendant and
Respondent.

COUNSEL

Hugh D. McLean for Plaintiffs and Appellants.

Kane & Whelan and Mark C. Kane for Defendant and Respondent.

**OPINION**

**BENKE, Acting P. J.**—Consistent with all of the out-of-state authorities which have considered the issue, in this case we hold an insured homeowner may recover the replacement cost of fire damage to an insured home by purchasing another home at another location. Accordingly, we reverse the judgment entered in favor of the defendant insurer.

### FACTUAL AND PROCEDURAL SUMMARY

The facts which give rise to this appeal are, in all material respects, undisputed. In November 1989 plaintiffs and appellants William Conway

and Ken Whalen (Conway) purchased a house at 252 Daisy Avenue in Imperial Beach. Conway paid $230,000 for the house and subsequently rented it to tenants. Conway obtained $100,000 in fire insurance on the property from defendant and respondent Farmers Home Mutual Insurance Company (Farmers).

On March 11, 1990, the house was damaged by fire. Although the house could have been repaired, Conway decided not to make any repairs because Conway believed it made more economic sense to develop the Daisy Avenue parcel in conjunction with development of an adjacent parcel Conway owned. Instead of repairing the damage on Daisy Avenue, within three months of the fire Conway paid $230,000 for another single-family home on Ebony Avenue in Imperial Beach.

Following the fire Conway and Farmers submitted the amount of the fire loss to a panel of appraisers. The appraisers found the replacement cost of the fire loss was $90,721 but the actual cash value of the property destroyed was $76,279.44. Thereafter Farmers paid Conway $76,279.44.

On March 8, 1991, Conway filed a declaratory relief action against Farmers. Conway's complaint alleged Farmers was obligated to pay the replacement value of the loss, rather than the actual cash value.

Sitting without a jury, the trial court found in favor of Farmers. The trial court reasoned that because the Daisy Avenue house could have been repaired, Conway was not entitled to the replacement cost of the loss. Judgment was entered in favor of Farmers and Conway filed a timely notice of appeal.

## DISCUSSION

 The policy Farmers issued to Conway promises that in the event of a fire at the insured premises, Farmers will pay for: "c. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following: [¶] (1) If at the time of loss the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately prior to the loss, we will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts: [¶] (a) the limit of liability under this policy applying to the building; [¶] (b) the replacement cost of that part of the building damaged for equivalent construction and use on the same premises; or [¶] (c) the amount actually and necessarily spent to repair or

replace the damaged building. . . . [¶] (4) When the cost to repair or replace the damage is more than $1000 or more than 5% of the amount of insurance in this policy on the building, whichever is less, we will pay no more than the actual cash value of the damage until actual repair or replacement is completed."

The parties vigorously dispute the meaning of the terms "replace" and "replacement" in paragraphs c.(1)(c) and c.(4). Farmers argues that when a building may be repaired, these terms require that any replacement of damaged property occur at the same location as the damaged building. Conway argues the policy places no restriction on where an insured may replace a damaged building.

In resolving this conflict we begin by noting there is no reported California case which discusses whether the replacement cost of a fire loss may be recovered where the insured decides to replace a damaged building by purchasing another building at a different location. However Conway's interpretation of the Farmers policy is supported by all of the out-of-state authorities which have considered the issue. (See, e.g., *S and S Tobacco* v. *Greater New York Mut.* (1992) 224 Conn. 313 [617 A.2d 1388, 1391]; *Huggins* v. *Hanover Ins. Co.* (Ala. 1982) 423 So.2d 147, 150; *Smith* v. *Michigan Basic Property Ins. Assn.* (1992) 441 Mich. 181 [490 N.W.2d 864, 868]; *Ruter* v. *Northwestern Fire & Marine* (1962) 72 N.J.Super. 467, 471-473 [178 A.2d 640, 643]; *Johnson* v. *Colonial Penn Ins. Co.* (1985) 127 Misc.2d 749, 751-752 [487 N.Y.S.2d 285]; *Blanchette* v. *York Mut. Ins. Co.* (Me. 1983) 455 A.2d 426, 427-428; see also *Hess* v. *North Pacific Ins. Co.* (1993) 122 Wn.2d 180 [859 P.2d 586, 588] [*Hess*].)

The court in *Hess* explained the genesis of the replacement cost provisions of fire policies: "Traditional coverage was for the actual or fair cash value of the property. The owner was indemnified fully by payment of the fair cash value, in effect the market value, which is what the owner lost if the insured building was destroyed. [Citation.] [¶] However, it was recognized that an owner might not be made whole because of the increased cost to repair or to rebuild. Thus, replacement cost coverage became available. 'Replacement cost coverages . . . go beyond the concept of indemnity and simply recognize that even expected deterioration of property is a risk which may be insured against.' " (*Hess, supra,* 859 P.2d at p. 587.)

Significantly the policy in *Hess* contained standard limitations on the recovery of replacement costs identical to the ones in Farmers's policy. Although writing in the context of a dispute over whether the recovery of

replacement costs is permissible where an insured has not actually made any replacement, the court adopted the following interpretation of those limitations: " 'The first measure, of course, limits the amount available for replacement to policy limits, while the second relates to a theoretical or hypothetical measure of loss: that is, the replacement cost of rebuilding the identical structure as one limit of the company's liability. *This particular limitation does not require repair or replacement of an identical building on the same premises, but places that rebuilding amount as one of the measures of damage to apply in calculating liability under the replacement cost coverage. The effect of this limitation comes into play when the insured desires to rebuild either a different structure or on different premises. In those instances, the company's liability is not to exceed what it would have cost to replace an identical structure to the one lost on the same premises. Although liability is limited to rebuilding costs on the same site, the insured may then take that amount and build a structure on another site, or use the proceeds to buy an existing structure as the replacement, but paying any additional amount from his or her own funds.*

"Finally, the third limitation of liability strengthens the requirement that liability of the company does not exist until repair or replacement is made. The purpose of this limitation is to limit recovery to the amount the insured spent on repair or replacement as yet another measure of the loss liability of the insurer. This third valuation method is intended to disallow an insured from recovering, in replacement cost proceeds, any amount other than that actually expended.' [Citation]."[1] (*Hess, supra,* 859 P.2d at p. 588, italics added.)

 We believe the result reached by the out-of-state authorities is the same one required under principles of contract interpretation established by our Supreme Court. In *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 821-822 [274 Cal.Rptr. 820, 799 P.2d 1253], the court stated: "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.] [¶] If there is ambiguity, however, it is resolved by

[1]The interpretation adopted by the court in *Hess* was taken from Jordan, *What Price Rebuilding?* (Spring 1990) 19 The Brief 17, 19-20.

interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.] In the insurance context, we generally resolve ambiguities in favor of coverage. [Citations.] Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. [Citations.] These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. [Citations.] Because the insurer writes the policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage."

■ In summarizing these rules the court in *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545], stated: "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If contractual language is clear and explicit, it governs. [Citation.] On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [Citation.]"

■ In applying these principles to the instant dispute, we find no support for Farmers's interpretation. First, we note the ordinary and popular sense of the policy provisions does not clearly and explicitly include the restrictions on payment of replacement value which Farmers suggests. The dictionary definition of "replace" is: "1: to place again: restore to a former place, position, or condition 2: to take the place of: serve as a substitute for or successor of: SUCCEED, SUPPLANT 3: to put in place of: provide a substitute or successor for 4: to fill the place of: supply an equivalent for." (Webster's New Internat. Dict. (3d ed. 1968) p. 1925.)

The dictionary definition does not draw any distinction between what can be repaired and what cannot be repaired. More importantly, although the term replace certainly includes rebuilding on the same premises, the term

also includes the notion of substituting for an original item another item which serves the same function as the original but is different in nature from the original. This broader and widely accepted meaning would certainly encompass the purchase of another house at a different location. Thus at best, Farmers can only contend there is an ambiguity in the policy with respect to the limitations on replacement of a damaged home.

In the absence of a clear and explicit meaning, we turn to what Farmers believed its insured would understand were the restrictions on recovery of replacement cost. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 822.) Again we find nothing in the record or on the face of the policy which supports Farmers's interpretation. The policy promises that, subject to enumerated limitations, payment for damaged buildings will be at replacement cost without any deduction for depreciation. Moreover, taken together the limitations in paragraphs c.(1)(b) and c.(1)(c), suggest that purchase of a replacement home is a permissible alternative. Paragraph c.(1)(b) limits recovery to the replacement cost for equivalent construction on the same premises; without reference to the same premises paragraph c.(1)(c) further limits replacement cost to the actual amount spent on repair or replacement. The reference in one limitation to the same premises and the absence of such a reference in the other limitation might easily be understood as contemplating, rather than eliminating, the possibility of replacement at another premises. Having failed to clearly and unmistakably restrict payment of replacement cost to replacement on the same premises, Farmers cannot contend that the insured would nonetheless understand that such a limitation exists. (See *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 809 [180 Cal.Rptr. 628, 640 P.2d 764].)

Because the ordinary and popular use of "replace" includes the purchase of a replacement dwelling at another location and no other provision of the policy alerts the insured to a narrower limitation on payment of replacement costs, Farmers's argument brings us to the rule which requires that ambiguities are to be resolved in favor of the insured. (*AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at pp. 822-823.) Under this rule of construction we reach the same result as the other courts which have considered the issue: the insured's purchase of a replacement dwelling at another location did not prevent recovery of the replacement cost of the insured loss.

Aside from Conway's failure to repair the house at Daisy Avenue, no other defense to payment of the replacement cost of Conway's loss appears on the record; thus the judgment entered in favor of Farmers must be reversed. Accordingly, the judgment is reversed and remanded for further

proceedings consistent with the views expressed in this opinion. Appellants to recover their costs of appeal.

Froehlich, J., and Nares, J., concurred.