Filed 10/15/21

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| MARISSA JANNEY, as Successor in Interest, etc., | C089534 |
| Plaintiff and Appellant, | (Super. Ct. No. SCCVCV15-1149-1) |
| v. | |
| CSAA INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Siskiyou County, JoAnn M. Bicego, Judge.  Affirmed.

The O'Connor Law Firm and Timothy J. O'Connor for Plaintiff and Appellant.

Coddington, Hicks & Danforth, R. Wardell Loveland, and Min K. Kang for Defendant and Respondent.

Peggy Baltar's home in Siskiyou County was destroyed by a wildfire in September 2014.  She ultimately had a new house built on the same property.  Her insurer, CSAA Insurance Exchange (CSAA), paid the full amount charged by her contractor for

1

construction of the new house.  Baltar sued for breach of contract and breach of the implied covenant of good faith and fair dealing.  According to Baltar, CSAA breached the insurance policy by, among other things, failing to provide her with a complete and accurate estimate for replacing the original house, which would have provided her with a budget for the construction of the new house; without such a budget, she claims, she was forced to build a cheaper house than the one destroyed by the fire.  She claims this, and other asserted breaches of the policy, amounted to bad faith and entitled her to punitive damages.  The trial court granted CSAA's motion for summary judgment and entered judgment in favor of the company.  Baltar appeals.[1]  We affirm.

BACKGROUND

In September 2014, Baltar's house in Weed was destroyed by the Boles Fire.  The homeowners policy she purchased from CSAA insured her against such an occurrence.

***Relevant Policy Provisions***

The policy's declarations page set out the following coverages in section I: $219,800 for the dwelling (Coverage A), $22,600 for other structures (Coverage B), $164,900 for personal property (Coverage C), and $87,920 for loss of use (Coverage D).  The policy also included an endorsement providing limited home replacement cost coverage.  This endorsement increased the coverage limits for the dwelling and other structures to "150% of the respective amounts" noted above if certain conditions were met.[2]  The endorsement further provides:  "Coverage is limited to the amount reasonably necessary to repair or replace the dwelling and other 'building structures,' but does not

---

[1]     Baltar passed away in April 2019, after the trial court's summary judgment ruling but before judgment was entered.  Baltar's daughter, Marissa Janney, was substituted into the action as Baltar's successor in interest and filed a timely notice of appeal.  For ease of reference, we refer to the contentions raised in this appeal as being raised by Baltar.

[2]     There is no assertion these conditions were not met in this case.

include any costs required to replace, rebuild, stabilize or otherwise restore or protect the land." Thus, the policy limits for repair or replacement of the dwelling and other structures was increased to $329,700 and $33,900, respectively, limited by the "reasonably necessary" qualification noted above.

The policy's loss settlement provisions relating to repair or replacement of the dwelling and other structures provide:

"Covered property losses are settled as follows: [¶] . . . [¶]

"b.     'Building structures' under Coverage A or B at 'replacement cost' without deduction for depreciation, subject to the following:

"(1)    . . . we will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts:

"(a)    The limit of liability under this policy applying to the 'building structure';

"(b)    The 'replacement cost' of that part of the 'building structure' damaged for equivalent construction and use on the same premises; or

"(c)    The amount actually and necessarily spent to repair or replace the damaged 'building structure.' "

Paragraph 4 of this subdivision further provides that CSAA would "pay no more than the 'actual cash value' of the damage until actual repair or replacement is completed and costs incurred."

Additional relevant policy provisions will be set forth in the discussion portion of this opinion. For now, we simply note the policy also covered loss of "trees, shrubs, plants or lawns" up to "5% of the limit of liability that applies to the dwelling," as well as "the reasonable expense incurred" by the policyholder for debris removal.

### CSAA's Initial Handling of Baltar's Claim

On September 16, 2014, the day after Baltar's house was destroyed, she submitted a claim to CSAA. The company immediately acknowledged the claim and assigned a large loss claim adjuster to handle the matter. Three days later, after certain payments

3

were made to Baltar for loss of personal property, CSAA's large loss specialist, Rick McMullen, met with Baltar and inspected the property.

On September 22, Baltar notified CSAA that she had moved into a rental home, requiring payment of a security deposit in addition to monthly rent beginning October 1. The following day, CSAA paid Baltar additional sums for loss of personal property and also advanced her the security deposit for the rental home.

On September 24, McMullen completed a valuation report, estimating the actual cash value of the destroyed house to be $108,355.44. This valuation was based on square footage and other basic details of the structure. Three days later, CSAA paid Baltar and her lienholder $107,355.44 (estimated actual cash value, minus Baltar's $1,000 deductible).

About a week later, CSAA paid Baltar the balance of the policy limit for loss of personal property. Additional loss of use payments (totaling six months of rent, minus the amount advanced for the security deposit) were made in October.

Thus, about a month after the loss of her home, Baltar was paid the policy limit of $164,900 for loss of personal property, as well as the estimated actual cash value of the dwelling, plus loss of use payments allowing her to move into and pay rent at the rental home for six months.

### *Competing Reconstruction Estimates*

CSAA also consulted with Cronic Disaster Services (Cronic), a licensed general contractor located in Redding, to prepare a reconstruction estimate for Baltar's destroyed house. Cronic submitted the requested estimate in November 2014. On a page titled "Summary for dwelling," the estimate listed $180,984.39 as the replacement cost value. This valuation was based on a "Line item total" of $145,095.55, plus materials sales tax of $5,724.78, plus $30,164.06 in overhead and profit. However, various line items did not list the estimated cost for that item, but were instead simply designated "OPEN ITEM" or "AS OCCURRED." Thus, as Matthew Williams, the large loss specialist who

4

took over Baltar's claim in May 2016, admitted during his deposition, Cronic would "[m]ore than likely" have charged more than $180,984.39 to rebuild Baltar's house. Nevertheless, Williams understood that Cronic had agreed to rebuild the house for that price, "subject to [the] open items that would be paid as incurred."

On November 21, 2014, CSAA sent Baltar a letter following up on a previous phone conversation and informing her that the policy entitled her to "the actual cash value of [the] damaged building," which had already been paid, "along with the opportunity to make further claim for replacement cost." The letter attached the Cronic estimate described above and stated: "As discussed, our payment has been based upon an agreed price [of] $180,984.39 with Cronic who is a member [of] our Direct Repair Network. They have indicated their willingness to assist you in the reconstruction of the home if you so desire." The letter advised Baltar that she had the right to choose another contractor, but also noted that "reconstruction costs will vary by contractor and increased costs for equivalent construction are not in themselves grounds for adjustment in the amount necessary to repair the home." The letter continued: "Please review the estimate to assure its accuracy. If you believe something has been over looked please contact us immediately so that we may address your concerns. Additionally it is possible that the contractor may identify supplemental issues during the actual repair that will require additional work and payment."

About a week later, CSAA paid Baltar an additional $53,061.30 for replacement of the dwelling, $21,322.81 for replacement of other structures, and $13,037.58 for debris removal. Thus, by the end of the year, CSAA had paid Baltar a total of $160,416.74 for the dwelling ($180,984.39 total replacement cost value estimated by Cronic, minus depreciation of $19,567.65, minus the $1,000 deductible). The payments for replacement of other structures and debris removal were also based on Cronic's estimate.

In May 2015, Baltar entered into a contract with a different contractor, J. Carleton Company, to build her a new house on the same property for $260,000. Rather than

5

confer with CSAA regarding whether the company considered this amount reasonably necessary to replace the original dwelling, Baltar retained the services of Robert Ellenberg, a licensed public adjuster with Unity Adjustments, to have her own replacement cost estimate prepared. As Ellenberg explained in his declaration: "I retained an estimator, Victor Romero of Construction First, to work with Ms. Baltar's contractor John Carleton to calculate a more complete replacement cost estimate for Ms. Baltar's home. Ms. Baltar's contractor checked and corrected the estimate, and authorized me to submit the estimate to CSAA under his company name." This estimate listed $346,998.57 as the replacement cost value of the dwelling, more than $17,000 above the policy limit for the dwelling coverage.

Ellenberg submitted the estimate to CSAA in August 2015. He wrote in the cover letter: "The first measure of what is to be established in determining what an insured may be due under the terms of their policy is almost never properly calculated–THE REPLACEMENT COST for what they actually had." After noting that Baltar's policy entitled her to "the *smallest*" of various amounts, one being the cost of replacing the structure using equivalent construction, Ellenberg continued: "*Determining the Replacement Cost as defined in the policy can only be done by an accurate and in depth determination of the specifications to which the building was built. This must include all aspects of a project that would be necessary to rebuild the home as it existed at the time of the fire AND VERIFIED BY A LICENSED CONTRACTOR WHO WOULD CARRY OUT THE REPLACEMENT IF IT WERE BEING DONE.* This might be totally different than the replacement choice which the insured makes. The amount actually spent is an entirely separate measure of what might be due under the terms of the policy."

The following month, Baltar and various other policyholders retained counsel to assist them in recovering under their respective policies. Baltar's attorney and CSAA agreed to a tolling of the statute of limitations to allow the company "to continue working

6

with Unity Adjustments to resolve the claims instead of escalating . . . immediately to a litigation posture."

Thereafter, between December 2015 and March 2016, CSAA sent Baltar and her attorney a series of letters asking for additional information, including the construction plans for the replacement house. These requests were apparently forwarded to Ellenberg, who explained in his declaration: "I did not provide Ms. Baltar's Carleton contract to CSAA while the replacement home was under construction because I was waiting for an answer from CSAA on the replacement cost estimate."

Meanwhile, CSAA reviewed the Romero estimate internally but did not inform Baltar or Ellenberg that it had done so. In an April 2016 e-mail from McMullen to large loss supervisor Gabby Martinez, McMullen provided a comparison of the competing estimates and concluded certain items in the Romero estimate were unnecessary and other items were not covered within the dwelling coverage, resulting in an adjusted replacement cost total of $227,611.93. Williams also reviewed the Romero estimate and concluded it "exceeded the scope of work that was reasonably related to the subject loss" and that both "the scope of work and prices reflected in the estimate . . . [were] not reasonable or necessary to rebuild [Baltar's] home after the Boles Fire."

### Completion of the New Home and Payment of Actual Construction Costs

Between January 2015 and March 2016, CSAA paid Baltar a total of $6,523.75 for the creation of construction plans for the new home and an additional $11,820 for loss of use while it was being constructed. After the initial contract with J. Carleton Company was entered into in May 2015, the price of that contract was adjusted downward by two change orders, ultimately resulting in a revised contract amount of $252,688.

The house was completed and a certificate of occupancy was issued in May 2016. As mentioned, Williams was assigned to take over the claim that month. On May 26, Williams sent Ellenberg a letter listing the total payments CSAA had made up to that date: $179,978.07 for the dwelling, $164,900 for personal property, $16,620 for loss of

7

use, and $21,322.81 for other structures. Williams asked Ellenberg to provide "a current status of the rebuild of the home" and to notify him "if there is anything outstanding for this loss."

Williams also spoke with someone at Unity Adjustments on June 3 and was informed the construction of the replacement house was complete. Three days later, he sent another letter to Ellenberg.[3] This letter stated: "We believe the rebuild of the insured's home has been completed. At your earliest convenience, please provide us with the verification of the completed rebuild, including but not limited to; paid permit fees, paid architect, engineering and plan fees, photos of both the interior and exterior of the home showing the status of the rebuild, a signed Certificate of Completion from the contractor and insured, and a final paid invoice showing the amount the insured paid for the work done on the home."

Receiving no response from Ellenberg, Williams sent follow-up letters requesting the same information on June 22, July 22, August 19, September 15, and October 14. Ellenberg responded on October 27, attaching various invoices from J. Carleton Company, as well as the change orders indicating the revised contract amount of $252,688. Williams responded on November 23, informing Ellenberg that CSAA was reviewing these documents.

On December 6, Williams wrote to Ellenberg seeking clarification regarding the total amount Baltar was claiming for loss of the dwelling. Apparently, in the meantime, Ellenberg had a conversation with another CSAA employee, large loss specialist Nicholaus Gorman, and stated Baltar was seeking $260,856.86. Williams asked Ellenberg whether this amount was for the dwelling alone or for other structures as well,

---

[3]    The same day, CSAA paid Baltar an additional $1,277.19 for loss of other structures, the balance of the policy limit listed on the declarations page for this category of coverage.

8

and if the latter, how much was requested for each. Williams noted the documents Ellenberg submitted showed the revised contract price for the new house was $252,688 and asked him to explain "the difference between the revised contract and the amount you are seeking." Williams also asked for additional breakdowns of "any code upgrade work that may have been needed for the re-build," as well as the contractor's "broken down estimate" for the project, and "the total [Baltar] paid in the separate receipts that were submitted" because certain receipts were difficult to read. Receiving no response, Williams sent a follow-up letter on December 22 seeking the same information.

On January 17, 2017, Ellenberg responded and confirmed the amount Baltar paid J. Carleton Company for the new house was $255,088. He provided no additional breakdowns, but noted CSAA should have the replacement cost estimate previously submitted. Three days later, Williams wrote back, explaining that CSAA did have the Romero estimate of $346,998.57, but the company did not have any "estimate or contract from the contractor who completed the work." Williams again asked for an explanation as to why the amount Baltar paid was more than the revised contract amount listed at $252,688.

On February 16, another follow-up letter requesting the same information was sent to Ellenberg, who responded by e-mail indicating that CSAA should contact the contractor directly to obtain the requested information. CSAA did so and eventually obtained additional information. On May 12, Williams wrote a letter to Ellenberg acknowledging receipt of the information and advising him that it was being reviewed.

Based on the information provided by J. Carleton Company, CSAA determined it owed Baltar an additional $60,771.26 for the dwelling and $11,300 for other structures.[4]

---

[4] The $11,300 amount brought the amount paid for other structures to the policy limit of $33,900, reflected on the declarations page modified by the replacement cost coverage endorsement. The $60,771.26 amount paid for the dwelling was calculated as

9

These amounts were paid on July 18. On August 17, CSAA also paid an additional $24,250.01 for code upgrade expenses.

On September 1, Williams sent a letter to Baltar listing the total payments CSAA had made up to that date: $264,999.34 for the dwelling, $164,900 for personal property, $16,620 for loss of use, and $33,900 for other structures. Williams asked Baltar to let him know if there were any outstanding issues that CSAA needed to address in order to conclude the claim. Monthly follow-up letters conveying the same information were sent to Baltar between September 2017 and July 2018.

No outstanding issues were identified by Baltar until June 22, 2018, when she testified at her deposition that certain landscaping and nursery invoices had not been paid. CSAA reviewed the invoices and determined it owed an additional $12,095.80. This amount was paid on July 11.

On August 3, Williams sent another letter to Baltar listing the total payments CSAA had made up to that date. Williams again asked Baltar to let him know if there were any outstanding issues that CSAA needed to address in order to conclude the claim. Follow-up letters conveying the same information were sent to Baltar on August 31 and September 28.

No additional outstanding issues were identified by Baltar until December 2018, when she responded to CSAA's motion for summary judgment and claimed for the first time that CSAA owed additional amounts for debris removal. We describe this claim in greater detail below.

---

follows: $255,088 (amount Baltar paid J. Carleton Company for both the dwelling and other structures), minus $33,900 (amount CSAA paid Baltar under the other structures coverage), plus $13,037.58 (for debris removal), plus $6,523.75 (for plans and permits), equals a total dwelling replacement cost of $240,749.33. This amount minus the $179,978.07 already paid to Baltar under the dwelling coverage equals $60,771.26.

### *The Lawsuit and Summary Judgment Motion*

As previously mentioned, Baltar sued CSAA for breach of contract and breach of the implied covenant of good faith and fair dealing, seeking punitive damages for the latter alleged breach.  Her operative second amended complaint was filed in October 2016.

CSAA moved for summary judgment in October 2018.  CSAA argued it did not breach its contract with Baltar as a matter of law because the undisputed evidence established that it "paid all amounts due under the policy."  CSAA argued that, "[w]ith the exception of the Romero Estimate generated *after* [Baltar] was in contract with [J. Carleton Company], all expenses covered by the policy and submitted to CSAA for reimbursement have been paid."  CSAA further argued "the Romero Estimate does not support a claim for additional policy benefits" because the policy expressly limited Baltar to "the smallest of various amounts, including 'the amount actually and necessarily spent to repair or replace the damaged "building structure." ' "  Because CSAA paid Baltar the amount she paid J. Carleton Company to build the new house, nothing more was owed under the dwelling coverage.

Turning to Baltar's bad faith cause of action, CSAA argued it "acted reasonably in the handling of [her] claim," noting it paid her the policy limit for the personal property and the other structures coverages, and further paid all amounts submitted by Baltar for loss of use.  With respect to the dwelling coverage, CSAA explained it initially paid Baltar the estimated actual cash value of the destroyed house, then supplemented that amount based on the Cronic estimate of the replacement cost value, and further supplemented that amount when Baltar finally revealed the amount she "actually and necessarily spent to replace the building structure."  CSAA argued:  "If [Baltar] thought some aspect of her claim had not been paid, CSAA had no idea because [she] and her representatives accepted CSAA's payments and have not requested additional payment.  Indeed, when [Baltar] was deposed in this lawsuit, she testified that certain landscaping

11

expenses had not been reimbursed.  When CSAA was informed of that testimony, it reviewed those invoices and issued payment within 30 days.  Nothing further has been submitted to CSAA for review or consideration."

CSAA additionally argued that even if it was found to have breached the insurance contract, it did not do so in bad faith as a matter of law because there was a "genuine dispute" over the existence of coverage or the amount owed.  Nor, CSAA argued, was Baltar entitled to punitive damages, there being no oppression, fraud, or malice as a matter of law.

### *Baltar's Summary Adjudication Motion and Opposition Filing*

About a week after CSAA's summary judgment motion was filed, Baltar filed a motion for summary adjudication of five identified issues of duty.  These can be condensed to the following:  (1) whether CSAA had a duty to advise Baltar of the all available coverage under the policy, including the full amount of replacement cost coverage available under the policy based on CSAA's estimate of the replacement cost; and (2) whether CSAA had a duty to adjust any replacement cost estimate submitted on Baltar's behalf and provide that adjusted estimate to Baltar, notifying her of any increase in the replacement cost coverage available under the policy.

Baltar also filed an opposition to CSAA's motion for summary judgment, arguing "CSAA breached the policy and acted in bad faith in at least three major respects: (A) CSAA deprived . . . Baltar of the benefits of the contract by insisting on an unreasonable lowball estimate of the cost to replace [her] lost home; (B) CSAA failed to pay the amounts due under the separate landscaping . . . coverage in the Policy until July 2018, despite knowing about the landscaping losses no later than November 2014; and (C) CSAA still to this day has not paid most of the debris removal costs incurred by Ms. Baltar."

With respect to the first claimed breach, Baltar argued the Cronic estimate was so "unreasonably low" that she was required to retain Unity Adjustments to prepare a more

12

accurate replacement cost estimate, and "[w]hen CSAA would not acknowledge the full amount of available coverage, [she] was forced to economize on the rebuild because she could not afford to fully replace her house." Baltar argued CSAA's handling of the replacement cost estimate "breached the contract and also amounted to bad faith" because CSAA "failed to establish an agreed on scope of loss[,] . . . deprived [her] of benefits under the Policy[, and] . . . violated industry standards and [title] 10 [California Code of Regulations] [section] 2695.4[ subdivision ](a) [and] . . . [title] 10 [California Code of Regulations] [section] 2695.9."

With respect to the delayed payment of landscaping costs, Baltar argued CSAA had sufficient information from which to determine the total amount of her landscaping loss in November 2014, and Baltar's expert would "testify that failure to pay promptly is a breach of the contract, that unreasonable delay in payment is a breach of the carrier's duty of good faith, and that CSAA's delay in payment for landscaping in this case was unreasonable given the information CSAA had about . . . Baltar's landscaping loss." Turning to the claimed failure to pay the total amount owed for debris removal, she argued: "CSAA still has not paid the amounts owed for debris removal. On November 26, 2014[,] CSAA's records indicate CSAA issued a check for $13,037.58 to Ms. Baltar based on the Cronic estimate for debris removal. The actual debris removal bill from the City of Weed was $62,008.29. Ms. Baltar's public adjuster submitted this information to CSAA along with the replacement cost estimate no later than August 2015. CSAA still has not paid the $48,970.71 remainder of the debris removal bill."

Baltar additionally argued the genuine dispute doctrine did not shield CSAA from bad faith liability, and CSAA's bad faith entitled her not only to punitive damages, but also damages for emotional distress, attorney fees, public adjuster fees, costs of bringing the lawsuit, and interest.

13

In reply, CSAA argued Baltar did not set forth specific facts showing a triable issue of material fact with respect to either of her causes of action. Noting that Baltar was not entitled to more than the actual cash value of the destroyed house until she replaced it, CSAA argued Baltar neither alleged nor offered any evidence to show she did not receive an appropriate actual cash value amount immediately after the loss. Nor did Baltar offer any evidence disputing the fact that she thereafter received the full amount actually spent to replace the house. Addressing Baltar's argument that she was forced to build a less expensive house than the one she could have built had CSAA adjusted the Romero estimate and provided her with that adjusted replacement cost amount, CSAA responded by noting Baltar testified in her deposition "that the home she had before the fire was essentially the same as the home that she rebuilt." CSAA also noted the new house "was <u>larger</u> than her previous home by *over 500 square feet*" and characterized her arguments that CSAA "forced down the cost and quality of [her] rebuild" such that "she did not and could not rebuild what she had before the fire" as "disingenuous."

With respect to landscaping and debris removal, CSAA argued these expenses were not owed until they were incurred and brought to CSAA's attention. CSAA argued the receipts Baltar submitted for landscaping "were unclear, and CSAA's request for clarification was ignored." "At worst," the company argued, "the landscaping expenses were inadvertently overlooked, and paid by CSAA once the oversight was brought to the adjuster's attention." With respect to the City of Weed's debris removal bill, CSAA argued Baltar "does not have a personal claim for those expenses" as a matter of law because the undisputed evidence established that the city waived personal liability of the property owners for debris removal. Thus, "the amount to be paid is an issue between CSAA and the City of Weed."

### *Trial Court's Ruling*

The trial court granted summary judgment in favor of CSAA.[5] With respect to payment of amounts due under the dwelling coverage, the trial court concluded CSAA produced undisputed evidence showing it paid the amount actually and necessarily spent to replace the destroyed house under measure (c) of the relevant loss settlement provision. In reaching this conclusion, the trial court rejected Baltar's argument that CSAA was nevertheless "required to determine replacement cost under measure (b)" even "after she entered into a written contract to rebuild her home and while construction was in progress." The trial court also explained that the letter Ellenberg sent to CSAA along with the Romero estimate "did not put CSAA on notice that Ms. Baltar was dissatisfied with the contract she had entered into with J. Carleton Company or that she had concerns that the contract would not ultimately provide her with a home substantially similar to the home she had lost." Nor did Baltar produce any evidence that she brought any such concerns to CSAA's attention during the construction of the new home. "Rather," the trial court continued, "the evidence establishes that [Baltar] and/or her representatives purposely withheld the construction contract from CSAA until after construction was complete. The evidence also established that Ms. Baltar's new home was significantly larger than her original home but that CSAA nevertheless paid for the costs of construction without objection." The trial court concluded CSAA satisfied its obligations under the policy as a matter of law by paying the amount actually and necessarily spent to replace the house, i.e., the smallest of the three measures set forth in the policy's loss settlement provision.

---

[5] The trial court also sustained various objections CSAA made to Baltar's evidence. Where relevant to the claims raised in this appeal, we address these evidentiary rulings in the discussion portion of the opinion.

With respect to the asserted delayed payment of landscaping costs and failure to pay the full amount for debris removal, the trial court also concluded there was no breach of contract as a matter of law. The trial court concluded: "The undisputed evidence establishes that CSAA paid actual cash value [for the landscaping loss] and that they were not advised that Ms. Baltar had incurred replacement costs for landscaping until she was deposed in this case. Upon thereafter receiving receipts from the landscaper and nursery, CSAA issued payment consistent with those receipts." As for debris removal, the trial court explained undisputed evidence established that the City of Weed informed Baltar that she was responsible to pay only the amount of " 'insurance proceeds designated for debris removal.' " Thus, Baltar was required to pay only the $13,037.58 she received from CSAA for debris removal. The trial court noted, however, that should Baltar be required to pay more than that for debris removal, "there may still be amounts due for debris removal under the policy."

Finally, having found no breach of contract as a matter of law, the trial court concluded Baltar's bad faith cause of action also failed as a matter of law on these undisputed facts.

This appeal followed.

DISCUSSION

I

***Summary Judgment Principles***

We begin by summarizing several principles that govern the grant and review of summary judgment motions under section 437c of the Code of Civil Procedure.

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law. [Citation.] The burden of persuasion remains with the party moving for summary judgment. [Citation.]" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*); Code Civ. Proc., § 437c, subd. (c).) Thus, a defendant moving

16

for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; Code Civ. Proc., § 437c, subd. (*o*)(2).) Such a defendant also "bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists. Once the initial burden of production is met, the burden shifts to [plaintiff] to demonstrate the existence of a triable issue of material fact." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1250.)

On appeal from the entry of summary judgment, "[w]e review the record and the determination of the trial court de novo." (*Kahn*, *supra*, 31 Cal.4th at p. 1003.) "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. [Citation.] We can find a triable issue of material fact 'if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' [Citation.]" (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433; see also *Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.)

## II

### *Analysis*

Baltar contends the trial court erred in granting CSAA's summary judgment motion because there are material factual disputes concerning: (A) whether CSAA breached the insurance policy by failing to provide a complete and accurate estimate of the cost to replace the original house or adjust Baltar's replacement cost estimate, failing to timely pay for landscaping, and failing to pay the full amount for debris removal; and (B) whether any of these alleged failures amounted to bad faith on the part of the insurance company. We address each argument in turn and conclude summary judgment was properly granted in this case.

17

## A.

### *Breach of Contract Claim*

In order to prevail against CSAA for breach of contract, Baltar must establish the following elements: (1) the existence of the contract, (2) Baltar's performance or excuse for nonperformance, (3) CSAA's breach, and (4) resulting damages. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.) CSAA argued below, and the trial court agreed, that Baltar could not establish the third element, breach of the insurance policy, because the undisputed evidence established that it "paid all amounts due under the policy." We agree.

### 1.

### *Preliminary Evidentiary Matter*

Before addressing Baltar's specific arguments regarding CSAA's purported breaches of the policy, we first address her assertion that the trial court erred in sustaining most of CSAA's objections to the declaration of her expert, Everette Lee Herndon. Contrary to her argument on appeal, the trial court's evidentiary rulings did not amount to "wholesale rejection" of the Herndon declaration. Instead, 21 of 32 specific objections were sustained in whole or in part. Baltar's opening brief, however, does not specifically address any of these 21 evidentiary rulings or offer any reasoned argument or citation to authority targeted towards any specific ruling.

Rather, citing *McCleery v. City of Bakersfield* (1985) 170 Cal.App.3d 1059, Baltar argues "[e]xpert testimony is often appropriate to determine the reasonableness of conduct in cases where industry principles and practices are beyond the knowledge of a layperson." She also cites the general proposition, set forth in *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, that expert declarations offered in opposition to a summary judgment motion must be construed more liberally than those offered in support of such a motion. We take no issue with these general propositions. However, as our colleagues at the Fifth Appellate District explained in *Summers v. A.L.*

18

*Gilbert Co.* (1999) 69 Cal.App.4th 1155: "There are limits to expert testimony, not the least of which is the prohibition against admission of an expert's opinion on a question of law." (*Id*. at p. 1178.) Much of Herndon's declaration amounts to legal conclusions with respect to what Herndon believed was required of CSAA under the policy. " '[T]he meaning of the [insurance] policy is a question of law about which expert opinion testimony is inappropriate. [Citations.]' [Citations.]" (*Id*. at p. 1180, quoting *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1100.)

"It is appellant's 'burden on appeal to affirmatively challenge the trial court's evidentiary ruling, and demonstrate the court's error.' [Citation.]" (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074.) Although Baltar claims generally that the trial court erred in sustaining CSAA's objections to the Herndon declaration, her opening brief does not identify distinct evidentiary rulings or provide legal argument tailored to the grounds upon which CSAA's evidentiary objections were sustained. She has therefore "failed to carry [her] burden to affirmatively show error in the trial court's rulings on the evidentiary objections. . . . In arguing only generalities, [Baltar has not provided] 'argument and citations to authority as to why the trial court's evidentiary rulings were wrong.' [Citation.] 'We are not required to search the record to ascertain whether it contains support for [her] contentions.' [Citation.]" (*Ibid*.)

Baltar's challenge to the trial court's evidentiary rulings is therefore forfeited.[6]

---

[6] To the extent Baltar's reply brief attempts to make up for this shortcoming by pointing out two specific paragraphs from Herndon's declaration that she believes should not have been excluded from evidence, she is too late. (*Eyford v. Nord* (2021) 62 Cal.App.5th 112, 126 ["arguments made in a reply brief for the first time are too late"].)

**2.**

*CSAA's Handling of the Replacement Cost Estimates*

Baltar argues disputed issues of material fact exist with respect to whether CSAA breached the insurance policy by failing to provide a complete and accurate estimate of replacement cost or adjust Baltar's replacement cost estimate. We are not persuaded.

As stated previously, the loss settlement provisions of Baltar's policy entitled her to recover the " 'replacement cost' " of the dwelling "subject to the following: [¶] (1) . . . we will pay the cost of repair or replacement, without deduction for depreciation, but not exceeding the smallest of the following amounts: [¶] (a) The limit of liability under this policy applying to the 'building structure'; [¶] (b) The 'replacement cost' of that part of the 'building structure' damaged for equivalent construction and use on the same premises; or [¶] (c) The amount actually and necessarily spent to repair or replace the damaged 'building structure.' "

In *Conway v. Farmers Home Mut. Ins. Co.* (1994) 26 Cal.App.4th 1185 (*Conway*), the court interpreted an identical provision. The court first explained, relying on *Hess v. North Pacific Ins. Co.* (1993) 122 Wash.2d 180 [859 P.2d 586], that "the genesis" of such provisions was the recognition that an insured covered by a traditional policy, providing only for payment of actual cash value of the property, " 'might not be made whole because of the increased cost to repair or to rebuild. Thus, replacement cost coverage became available. . . .' [Citation.]" (*Conway,* at p. 1189.) The court also adopted the *Hess* court's interpretation of the various measures of loss settlement:

" ' "The first measure, of course, limits the amount available for replacement to policy limits, while the second relates to a theoretical or hypothetical measure of loss: that is, the replacement cost of rebuilding the identical structure as one limit of the company's liability. This particular limitation does not require repair or replacement of an identical building on the same premises, but places that rebuilding amount as one of the measures of damage to apply in calculating liability under the replacement cost

20

coverage. The effect of this limitation comes into play when the insured desires to rebuild either a different structure or on different premises. In those instances, the company's liability is not to exceed what it would have cost to replace an identical structure to the one lost on the same premises. Although liability is limited to rebuilding costs on the same site, the insured may then take that amount and build a structure on another site, or use the proceeds to buy an existing structure as the replacement, but paying any additional amount from his or her own funds.

" ' "Finally, the third limitation of liability strengthens the requirement that liability of the company does not exist until repair or replacement is made. The purpose of this limitation is to limit recovery to the amount the insured spent on repair or replacement as yet another measure of the loss liability of the insurer. This third valuation method is intended to disallow an insured from recovering, in replacement cost proceeds, any amount other than that actually expended." [Citation.]' " (*Conway*, *supra*, 26 Cal.App.4th at p. 1190, fn. & italics omitted; see also *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 658.)

Thus, Baltar's policy entitled her to the smallest of the following three measures for the loss of her dwelling: (1) the policy limit, (2) the replacement cost for equivalent construction and use on the same premises, and (3) the amount actually and necessarily spent to replace the dwelling.

There is no dispute as to the policy limit: $329,700. There is also no dispute that Baltar spent $255,088 to replace the damaged home.[7] There is a dispute over the second potential loss settlement measure, the replacement cost. As set forth in greater detail above, CSAA initially estimated the replacement cost to be $180,984.39, subject to

---

[7] Although the record suggests a portion of this amount went to replace other structures, CSAA accepts this as the amount Baltar actually and necessarily spent to replace the dwelling.

21

increases for various open line items in the estimate. Not satisfied with that estimate, Baltar commissioned a second replacement cost estimate, which resulted in a replacement cost measure of $346,998.57. CSAA's large loss specialist, McMullen, later compared the competing estimates and adjusted the replacement cost measure to $227,611.93. However, these disputed amounts for the replacement cost are immaterial to the ultimate issue of whether CSAA owes Baltar additional money under the policy for replacement of the dwelling. This is because Baltar's replacement cost estimate exceeds the policy limit for the dwelling, making it the greatest of the potential loss settlement measures, and the policy expressly limits her recovery to the smallest of the three amounts. In theory, this policy provision limited her to the adjusted replacement cost measure of $227,611.93 since that was the smallest of the three loss settlement measures. However, CSAA ultimately paid Baltar the greater amount that she actually and necessarily spent to replace the home.

Stated simply, CSAA did not insist on paying Baltar the smaller adjusted replacement cost amount calculated by McMullen and instead paid her the greater amount she actually spent replacing the home. We agree with the trial court's conclusion that she is not entitled to more than this as a matter of law. Again, the " ' "third valuation method is intended to disallow an insured from recovering, in replacement cost proceeds, any amount other than that actually expended." [Citation.]' " (*Conway*, *supra*, 26 Cal.App.4th at p. 1190.) There is no dispute that Baltar received the amount she actually expended.

Nevertheless, Baltar argues she is entitled to more because CSAA employed an "illegal scheme" to reduce the amount she actually expended on the replacement home. In support of this argument, she relies on two insurance regulations, California Code of Regulations, title 10, sections 2695.4 and 2695.9.

The first of these regulations provides in relevant part: "Every insurer shall disclose to a first party claimant or beneficiary, all benefits, coverage, time limits or other

provisions of any insurance policy issued by that insurer that may apply to the claim presented by the claimant. When additional benefits might reasonably be payable under an insured's policy upon receipt of additional proofs of claim, the insurer shall immediately communicate this fact to the insured and cooperate with and assist the insured in determining the extent of the insurer's additional liability." (Cal. Code Regs., tit. 10, § 2695.4, subd. (a).) Baltar argues CSAA violated this provision by providing her with a "lowball" replacement cost estimate that "excluded entire categories of reasonable and necessary costs," thereby "refusing to advise [her] of the full amount of measure (b)" and concealing "available dwelling benefits."

The second cited regulation provides in relevant part: "If losses are settled on the basis of a written scope and/or estimate prepared by or for the insurer, the insurer shall supply the claimant with a copy of each document upon which the settlement is based. The estimate prepared by or for the insurer shall be in accordance with applicable policy provisions, of an amount which will restore the damaged property to no less than its condition prior to the loss and which will allow for repairs to be made in a manner which meets accepted trade standards for good and workmanlike construction. The insurer shall take reasonable steps to verify that the repair or rebuilding costs utilized by the insurer or its claims agents are accurate and representative of costs in the local market area. If the claimant subsequently contends, based upon a written estimate which the claimant obtains, that necessary repairs will exceed the written estimate prepared by or for the insurer, the insurer shall: [¶] (1) pay the difference between its written estimate and a higher estimate obtained by the claimant; or, [¶] (2) if requested by the claimant, promptly provide the claimant with the name of at least one repair individual or entity that will make the repairs for the amount of the written estimate. The insurer shall cause the damaged property to be restored to no less than its condition prior to the loss and which will allow for repairs in a manner which meets accepted trade standards for good and workmanlike construction at no additional cost to the claimant other than as stated in

23

the policy or as otherwise allowed by these regulations; or, [¶] (3) reasonably adjust any written estimates prepared by the repair individual or entity of the insured's choice and provide a copy of the adjusted estimate to the claimant." (Cal. Code Regs., tit. 10, § 2695.9, subd. (d).)

Baltar argues this provision "required CSAA to adjust the estimate submitted by Ms. Baltar [(i.e., the Romero estimate)] and send back a copy of the adjusted estimate, or to pay the estimate (at least up to policy limits). Instead of following the required approach, CSAA simply refused to consider the estimate or communicate with Ms. Baltar's public adjuster about it." Baltar argues CSAA's failure to comply with both provisions caused her to "fear she would not be able to recover enough from CSAA to replace her house," which resulted in her "build[ing] a less costly replacement house than she was entitled to build under the contract."

We agree the $180,984.39 total amount listed in the Cronic estimate was not sufficient to enable Baltar to build an identical replacement home on the same property. This is revealed by the estimate itself, which left various line items open. However, the letter CSAA sent to Baltar, with this estimate attached, accurately informed her that she was not entitled to more than the actual cash value of the house until the house was replaced, at which point she would be entitled to recover the replacement cost from CSAA. The actual cash value had already been paid. The letter informed Baltar that CSAA was also paying her the amount listed in the Cronic estimate, that Cronic had agreed to rebuild her home for that price (subject to the open items in the estimate), and that CSAA would make additional payments for necessary "additional work" identified by the contractor during the rebuild. The letter further informed Baltar that she was entitled to choose a different contractor to build the replacement home, but that she would not automatically be entitled to additional payments solely because her chosen contractor charged more for equivalent construction.

24

No reasonable insured would have read this letter as a hardline replacement cost offer. Nor do we agree with Baltar that this letter and the attached estimate amounted to concealment of available benefits under the policy in violation of California Code of Regulations, title 10, section 2695.4.

CSAA then paid Baltar the difference between the amount already paid under the dwelling coverage and the amount listed in the Cronic estimate, essentially an advance on the replacement cost since Baltar was not entitled to that amount until the house was replaced. Thereafter, Baltar entered into a contract with a different contractor, J. Carleton Company, to replace the house, ultimately for $255,088. She kept this information from CSAA and instead submitted the Romero estimate listing $346,998.57 as the replacement cost value. The letter sent to CSAA, with this estimate attached, acknowledged that Baltar was entitled to only "the *smallest*" of the replacement cost amounts, one of those amounts being "[t]he amount actually spent" by Baltar to replace the house. CSAA repeatedly asked for the details of the actual construction contract and was ignored. And when the amount Baltar actually spent to replace the house was finally revealed, that amount was promptly paid by CSAA. On these undisputed facts, we cannot conclude CSAA breached the insurance policy.

Nor did CSAA violate California Code of Regulations, title 10, section 2695.9, subdivision (d). As stated previously, this subdivision begins: "If losses are settled on the basis of a written scope and/or estimate prepared by or for the insurer, . . ." (*Ibid.*) That is not how losses were settled in this case. Instead, they were settled based on the amount Baltar actually and necessarily spent to replace the house. To be sure, had CSAA insisted on paying only the amount listed in the Cronic estimate, or the adjusted amount of $227,611.93, this subdivision would apply. Because it does not, we need not determine whether CSAA's conduct would have satisfied its provisions.

Finally, the notion that Baltar was forced to "build a less costly replacement house than she was entitled to build under the contract" is belied by the record. Even if CSAA

25

had done precisely what Baltar claims it was required to do under the regulations she cites, i.e., supply her with a more complete replacement cost estimate in the first instance or adjust the Romero estimate she submitted and provide her with the adjusted amount to inform her "of the upper limit on the funds available for rebuilding" (*SR Internat. Business Ins. Co. Ltd. v. World Trade Center Properties, LLC* (S.D.N.Y. 2006) 445 F.Supp.2d 320, 333), this would not have entitled Baltar to more than she received from CSAA under the dwelling coverage. This is because CSAA did adjust the Romero estimate and came to an adjusted amount of $227,611.93. Had CSAA provided Baltar with this amount, there is no reason to think she would have built a more expensive replacement house. The opposite is true. She either would have built a cheaper replacement house, staying within that adjusted replacement cost budget, or she would have built the same house she ultimately built in the hope of receiving her actual construction costs.

In other words, the only way Baltar would have potentially been entitled to *more* under the dwelling coverage is if (1) the hypothetical adjusted replacement cost estimate was more than the amount Baltar ultimately spent on the replacement house, and (2) based on that upper limit of available replacement funds, Baltar actually spent a greater amount to build the replacement house. Only then would the smallest of the three amounts provided for in the policy's loss settlement provisions have been the adjusted replacement cost estimate Baltar claims she was entitled to receive from CSAA.

However, there is no evidence in this record suggesting that CSAA was required to adjust the Romero estimate to somewhere between the $255,088 that Baltar actually spent and the $329,700 policy limits. None of the declarations submitted by Baltar in opposition to summary judgment support such a conclusion, even if we view Herndon's declaration in its entirety, as Baltar urges us to do. The closest Baltar comes is her own declaration, in which she states that she "did not have enough money to make the new house as nice as the old house," specifically pointing out that the house she lost in the fire

26

was "framed out of redwood," had "granite counter tops in the kitchen and bathroom," and had nicer cabinets, windows, and tile work. She also admits, however, that the replacement house she had built is "a little bit bigger than the old house." CSAA's evidence, undisputed by Baltar, establishes the replacement house was actually significantly larger than the original house. Baltar was entitled to build a larger replacement house. But her insurance policy did not require CSAA to pay for a replacement house that was both significantly larger and also "as nice" as the original house.

We conclude Baltar's evidence does not create a triable issue of material fact with respect to whether her insurance policy entitled her to more than she actually spent to build the replacement house. It did not.

**3.**

*Delayed Payment of Landscaping Costs*

Baltar also argues there is a material factual dispute with respect to whether CSAA breached the insurance policy by failing to timely pay for landscaping costs. CSAA argues "any delayed payment was mere oversight and an honest mistake" and the amount owed was promptly paid in full "upon notice of the additional costs for landscaping." We conclude the undisputed facts support CSAA's position in this regard.

Baltar's policy entitled her to additional coverage for "trees, shrubs, plants or lawns, on the 'residence premises.' " The policy provides: "The limit of liability for this coverage shall not exceed 5% of the limit of liability that applies to the dwelling as shown in the Declarations for Coverage A for all trees, shrubs, plants and lawns nor more than $500 for any one tree, shrub or plant, including expense incurred for removal."

As Baltar accurately observes, it is undisputed that CSAA's contractor, Cronic, estimated the landscaping loss to be $7,111.06 in November 2014. She also notes that CSAA's large loss specialist, Williams, testified in his deposition that CSAA considered such losses payable upon occurrence of the loss rather than upon replacement. CSAA

27

concedes in this appeal that this amount should have been paid in November 2014. However, when the matter was brought to CSAA's attention during Baltar's deposition, Williams immediately reviewed the landscaping receipts she provided and CSAA paid her $12,095.80 for the landscaping loss. There is no evidence in this record suggesting this delay in payment was anything other than inadvertent. Nor is there any evidence that the full amount owed was not ultimately, albeit belatedly, paid by CSAA. Moreover, the undisputed facts also reveal that Baltar is at least partially to blame for the length of the delay in payment. CSAA repeatedly sought information from Baltar regarding the replacement of her home. Baltar ignored these requests until October 2016. However, because many of the receipts she ultimately provided were difficult to read, CSAA asked Baltar to supply the total amounts paid on the various receipts submitted. That was also ignored. Had Baltar provided CSAA with the requested information at any time before 2018, the record strongly suggests they would have been immediately paid.

In any event, we need not determine whether CSAA's inadvertent delay in payment of landscaping losses amounted to a breach of the insurance policy because Baltar has presented no evidence that she suffered any damages as a result of the alleged breach. Her appellate argument that she suffered damages is not evidence of damage suffered. (See *Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1173 ["Argument of counsel is not evidence."].)

## 4.

### *Debris Removal Costs*

Baltar further argues there is a material factual dispute regarding whether CSAA breached the insurance policy by failing to pay the full amount for debris removal. In response, CSAA points out that Baltar was paid $13,037.58 for debris removal in November 2014, based on the Cronic estimate, and argues there is no evidence that she incurred additional costs for debris removal. CSAA acknowledges the Romero estimate lists $62,008.29 as the amount charged by the City of Weed for debris removal, but

28

argues this does not "indicate if the amount listed was actually incurred, expended or billed to [Baltar]." In any event, CSAA argues Baltar is "not personally liable for any amounts incurred by the City for debris removal from her property" because the city informed all property owners they were required to pay only the amount they received from their respective insurers that was specifically " 'designated for debris removal.' "

The city attorney's office later confirmed "the City of Weed has waived any request for the cost of debris removal [from property owners] in excess of the insurance proceeds that are specifically for debris removal." Accordingly, CSAA argues, the undisputed evidence establishes that Baltar was paid $13,037.58 for debris removal and that was the only amount she was required to pay the city for debris removal. The trial court agreed with this reasoning in granting summary judgment with respect to this issue. We do the same.

**B.**

***Bad Faith Claim***

Finally, Baltar argues disputed issues of material fact exist with respect to whether any of the foregoing alleged failures amounted to bad faith on the part of CSAA. She is mistaken.

" 'The covenant of good faith and fair dealing is implied in law to assure that a contracting party "refrain[s] from doing anything to injure the right of the other to receive the benefits of the agreement." [Citation.] In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' " (*Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1291-1292 (*Fraley*).)

"In a bad faith case, the 'primary test is whether the insurer withheld payment of an insured's claim unreasonably and in bad faith. [Citation.] Where benefits are withheld for proper cause, there is no breach of the implied covenant.' [Citation.] It is

well established that 'bad faith liability cannot be imposed where there "exist[s] a genuine issue as to [the insurer's] liability under California law." [Citation.]' [Citation.] '[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability.' [Citation.]" (*Fraley*, *supra*, 81 Cal.App.4th at p. 1292, italics omitted.)

In *Fraley*, our colleagues at the Fourth Appellate District held competing repair and replacement cost estimates created "a genuine dispute regarding [the insurer's] contractual obligations," explaining: "Where the parties rely on expert opinions, even a substantial disparity in estimates for the scope and cost of repairs does not, by itself, suggest the insurer acted in bad faith. Despite the ' "special relationship" ' [citation] between an insurer and its insureds, an insurer 'may give its own interests consideration equal to that it gives the interests of its insured[s].' [Citation.] [¶] The record reveals that [the insurer] handled the [the insureds'] claim reasonably, by retaining experts and investigating, paying the undisputed actual cash value of the loss and proceeding to appraisal on the disputed portion of the claim, replacement cost. Moreover, [the insurer] promptly paid the replacement cost appraisal award after the [insureds] purchased another home. We agree with the trial court that their bad faith claim fails as a matter of law." (*Fraley*, *supra*, 81 Cal.App.4th at p. 1293.)

Similarly, here, there was a genuine dispute with respect to the amount it would cost to rebuild Baltar's home on the same property. We have already described the competing replacement cost estimates and decline to repeat ourselves here. However, as also explained previously, Baltar was not entitled to more than the actual cash value of the dwelling until she actually replaced the structure. CSAA paid her that amount. The company then paid Baltar the amount she actually and necessarily expended to replace the dwelling. We have already concluded this was all she was entitled to receive under the express terms of the policy. We now conclude CSAA did not violate the implied covenant of good faith and fair dealing by providing Baltar with what she felt was an

30

"unreasonably low" replacement cost estimate. As *Fraley* makes clear, CSAA was entitled to rely on its own replacement cost estimate rather than accept Baltar's much higher estimate.

Nor are we persuaded by Baltar's argument that bad faith liability arises from "CSAA's refusal to comply with California law and nationally recognized fair claim handling practices." In making this argument, she refers us to the portion of her brief arguing that CSAA violated California Code of Regulations, title 10, sections 2695.4 and 2695.9. We have already concluded CSAA did not violate section 2695.4 of these regulations and section 2695.9 did not apply on these facts because CSAA did not insist on settling Baltar's claim based on the replacement cost estimate, but rather paid her the higher amount she actually spent on the replacement home.

With respect to CSAA's denial of payment for debris removal in excess of the $13,037.58 paid in November 2014, here too there was a genuine dispute. Indeed, we have already concluded no further payment is owed unless and until Baltar demonstrates she has expended or is obligated to expend more than that amount for debris removal. At the very least, there was a genuine dispute over whether CSAA owed additional amounts for debris removal.

Finally, with respect to the admitted late payment of landscaping costs, the undisputed facts establish the late payment was inadvertent and the full amount owed was paid immediately upon discovery of the oversight. We have already concluded Baltar has not provided evidence that she suffered damages from this alleged breach of contract. Nor has she provided evidence of any cognizable injury in tort. To the extent she claims CSAA's alleged bad faith in this regard entitles her to punitive damages, the undisputed facts establish the delay in payment was not intentional, let alone done with malicious intent, fraudulent motive, or conscious disregard for the rights of others. (*Taylor v. Superior Court* (1979) 24 Cal.3d 890, 894-895.)

31

To the extent she claims entitlement to "fees and costs incurred to enforce the contract," citing *Brandt v. Superior Court* (1985) 37 Cal.3d 813, that case held: "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss–damages–proximately caused by the tort. [Citation.] These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action." (*Id.* at p. 817.) But here, bringing suit against CSAA to recover benefits under the policy was not reasonably compelled by CSAA's allegedly tortious delay of payment of landscaping costs. All Baltar had to do was notify CSAA that these costs had not yet been paid. As soon as she did so, they were promptly paid. On these undisputed facts, Baltar is not entitled to *Brandt* fees even if she were to prove a bad faith delay of payment.[8]

In sum, CSAA's settlement of the dwelling coverage did not violate the implied covenant of good faith and fair dealing. Nor did the company's failure to pay more for debris removal than Baltar established she was obligated to pay for such removal. And finally, we need not determine whether CSAA's delay in payment of landscaping costs amounted to bad faith because "a bad faith action" requires the plaintiff "to establish actual financial loss" and Baltar "cannot show [she] suffered any cognizable injury in either contract or tort." (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1096.)

---

[8] Baltar also sought emotional distress damages, but concedes on appeal that her entitlement to such damages "likely died with her."

32

## DISPOSITION

The judgment is affirmed.  CSAA is entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/
HOCH, J.

We concur:

/s/
MAURO, Acting P. J.

/s/
DUARTE, J.